E-FILED
Thursday, 31 March, 2016  04:30:11 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, and THE STATES OF CALIFORNIA, COLORADO, DELAWARE, HAWAII, ILLINOIS, MONTANA, NEW JERSEY, NEW MEXICO, NEVADA, VIRGINIA, and the DISTRICT OF COLUMBIA, *ex rel*. THOMAS PROCTOR, <br><br> Plaintiffs and Relator, <br><br> v. <br><br> SAFEWAY INC. <br><br> Defendant. | Case No. 3:11-cv-03406-RM-TSH <br><br><br> JURY TRIAL DEMAND |

## FIRST AMENDED COMPLAINT WITH JURY DEMAND
## PURSUANT TO FEDERAL AND STATE FALSE CLAIMS ACTS

Thomas Proctor ("Relator") files this First Amended Complaint on behalf of the United States and the States of California, Colorado, Delaware, Hawaii, Illinois, Montana, New Jersey, New Mexico, Nevada, Virginia, and the District of Columbia (collectively referenced as "States" or "Plaintiff States"), against Safeway Inc. ("Safeway" or "Defendant") and alleges the following:

I.    **I**NTRODUCTION

1.     This is an action for damages and civil penalties on behalf of the United States of America and the Plaintiff States by the Relator (collectively referenced as the "Plaintiffs") against Safeway Inc. arising from Safeway's knowingly false "usual and customary" ("U&C") pricing fraud scheme perpetrated in its pharmacies nationwide against government health programs ("GHPs").[1]

2.     Safeway violated the False Claims Act and caused subsidiaries Safeway controls to violate the False Claims Act by routinely charging GHPs more than the general public for the same drugs. Specifically Safeway conceived and directed a centrally-controlled scheme to fraudulently report inflated prices for prescription drugs sold to GHP beneficiaries. Safeway knowingly failed to report its actual low drug prices in order to obtain higher reimbursements from GHPs than Safeway was legally and contractually entitled to receive.

3.     Safeway's fraud scheme was carried out nationwide at its affiliated pharmacies which are located in multiple states and jurisdictions. These include Alaska, Arizona, California, Colorado, Delaware, Hawaii, Idaho, Illinois, Maryland, Michigan, Montana, Nebraska, New Jersey, New Mexico, Nevada, Oregon, Pennsylvania, South Dakota**,** Texas, Virginia, Washington, Wyoming, and the District of Columbia.

4.     Safeway perpetrated this fraud scheme beginning in or around 2007 and continuing to the present.

---

[1] Safeway's "U&C" pricing fraud scheme includes pricing fraud affecting Medicaid, TRICARE, the Federal Employees Health Care Benefits Program, and Medicare. These different programs (including Medicaid in different states) have some variation in language articulating reimbursement rules. For example, as discussed below Medicare Part D reimbursement uses the term "negotiated" instead of "U&C" price. For the purposes of Relator's allegations this variation is immaterial.

5.      Safeway carried out this fraud scheme by setting up and imposing on its subsidiaries a discount generic drug formulary, a prescription benefits club, and a pharmaceutical price matching program in order to conceal from GHPs the lower prices Safeway charged for many prescription drugs, and by reporting and causing its subsidiaries to report falsely inflated pricing information to GHPs.

6.      Safeway administered this scheme in a uniform and consistent manner across the country through centralized policies and pharmaceutical pricing, using interconnected pharmacy and claims-processing computer systems shared by its subsidiaries.

7.      Through this U&C pricing fraud scheme, Safeway submitted false claims and caused its subsidiaries and third parties to submit false claims in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, as amended.

8.      Safeway's conduct also violated the analogous false claims acts and health care fraud remedial statutes of the ten Plaintiff States and the District of Columbia (hereafter collectively the "Plaintiff States"). Like the federal False Claims Act, these statutes impose liability for defined conduct in the nature of fraud, for the submission of false claims, the use of false records and documents, and the failure to disclose material information, in presenting claims to each respective sovereign's Medicaid program. The conduct of Safeway alleged in this complaint violated the following statutes of the Plaintiff States:

   a.   <u>California</u>: California False Claims Act, CAL.GOV'T CODE § 12560, *et seq.*;

   b.   <u>Colorado</u>:  Colorado Medicaid False Claims Act, COL. STAT.§ 25.5-4, *et seq.*;

   c.   <u>Delaware</u>:  Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, *et seq.*;

   d.   <u>District of Columbia</u>: District of Columbia False Claims Act, D.C. CODE § 2-308.13, *et seq.*;

   e.   <u>Hawaii</u>: Hawaii False Claims Act, HAW. REV. STAT. § 661-22, *et seq.*;

f. <u>Illinois</u>: Illinois False Claims Act, 740 ILL. COMP. STAT. 175/1, *et seq.*;

g. <u>Montana</u>: Montana False Claims Act, MONT. CODE ANN. § 17-8-401, *et seq.*;

h. <u>New Jersey</u>: New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-1, *et seq.*;

i. <u>New Mexico</u>: New Mexico Fraud Against Taxpayers Act, N.M. STAT. § 27-14-1, *et seq.*;

j. <u>Nevada</u>: Nevada False Claims Act, NEV. REV. STAT. § 357.010, *et seq.*; and,

k. <u>Virginia</u>: Virginia Fraud Against Taxpayers Act, VA.CODE ANN. § 8.01-216.1, *et seq.*

9.      Safeway also conducts or has conducted business in the states of Alaska, Arizona, Idaho, Maryland, Michigan, Nebraska, Oregon, Pennsylvania, South Dakota, Washington, and Wyoming and has submitted or caused to be submitted false claims to the Medicaid programs of those respective states through the use of false records and statements, and by failing to disclose material information in presenting its claims. Relator does not seek to recover under an enacted false claims act or similar health care fraud remedial statute for these states, but because Medicaid is a program jointly funded by the United States and each state, each false claim submitted or caused to be submitted by Safeway in each of those states is a false claim against the United States in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

10.     Safeway's unlawful acts in violation of the federal and state FCAs, as alleged herein, arise from the submission of false claims to federal and state healthcare programs for prescription drugs furnished to program beneficiaries, and Safeway's use of materially false records and statements in support of those false claims. More specifically, Safeway has knowingly submitted or caused to be submitted fraudulent, inflated pricing information on tens of thousands of prescription drug reimbursement claims to GHPs, including Medicare, Medicaid, TRICARE, the Federal Employees Health Care Benefits Program and other federal health care

programs for the purpose of unlawfully obtaining reimbursement payments higher than those authorized by law.

## II.  PARTIES

### A.  Defendant

11.     Defendant Safeway Inc. is a Delaware corporation with its principal place of business in Pleasanton, California. Defendant was incorporated in July 1986 as SSI Holdings Corporation, and thereafter its name was changed to Safeway Stores, Incorporated. In February 1990, Defendant adopted its current name of Safeway Inc. ("Safeway").

12.     Safeway is one of the largest food and drug retailers in the United States.

13.     Safeway acts through its officers, employees, agents, subsidiaries, and affiliates.

14.     At the time of the events alleged in this lawsuit, Safeway operated under the trade name Safeway or through various Safeway-affiliated store banners across the United States including but not limited to: Vons, Pavilions, Dominick's, Genuardi's, Randalls, Tom Thumb, Pak'n'Save Foods, and Carrs Quality Centers (collectively "Safeway affiliated banners"). Specifically:

    a.  In Texas, Defendant operated and continues to operate under the Randalls and Tom Thumb banners.

    b.  In California, Defendant operates or has operated under the Safeway, Vons, Pavilions and Pak' n' Save banners.

    c.  In Nevada, Defendant operates under the Vons and Safeway banners.

    d.  In Alaska, Defendant operates or has operated under the Safeway and Carrs banners.

    e.  In Illinois, Defendant operated under the Dominick's banner.

    f.  In Michigan, Defendant operated under the Vons banner.

    g.  In Pennsylvania, New Jersey, and Delaware, Defendant operated under the Genuardi's banner. Defendant's Pennsylvania and New Jersey stores have since

been sold or closed and now Defendant operates in Delaware under the Safeway banner.

    h.   In Colorado, Hawaii, Montana, Idaho, Nebraska, Maryland, New Mexico, Oregon, South Dakota, Virginia, Washington, Wyoming and the District of Columbia, Defendant operates under the Safeway banner.

15.    In January 2012, Defendant announced the planned sale or closure of its 25 Genuardi's bannered stores, located in Pennsylvania, New Jersey, and Delaware. At the time of this filing, all of Defendant's 25 Genuardi's stores had been sold, closed or converted to the Safeway banner.

16.    In 2014, Defendant exited the Illinois market where it had operated 72 Dominick's bannered stores. All of Defendant's 72 Dominick's bannered stores have been sold or closed.

17.    Pursuant to a merger agreement, on January 30, 2015, Safeway was acquired, with Safeway surviving the merger as a wholly owned subsidiary of Albertsons Holdings LLC.

18.    In connection with that merger, Safeway agreed to divest 57 stores for antitrust clearance and sold its Mid-Atlantic stores.

19.    After the merger and divestment, Albertson's reacquired some of the divested former Safeway and Safeway banner stores and reopened them under Safeway, Vons and Albertson's banners.

20.    Currently, Safeway is directly owned by Albertsons Companies, LLC. Albertsons Companies, LLC is directly owned by AB Acquisition LLC, which is the ultimate parent entity of Safeway.

21.    At least until the 2015 merger, Safeway and its affiliated banners were centrally managed and controlled by Safeway's national corporate management headquartered in Pleasanton, California. Safeway's corporate management controlled the policies, practices,

6

procedures, and operations of all of Defendant's stores which were operated by Safeway as a common enterprise.

22.     According to Safeway's 2015 SEC 10k Annual Report, "Safeway is organized into seven geographic retail operating segments (Denver, Eastern, Northern California, Phoenix, Northwest, Texas, and Southern California). Across all seven retail operating segments, the Company operates primarily one store format where each store offers the same general mix of products with similar pricing to similar categories of customers." "The seven operating segments have been aggregated into one reportable segment called Safeway, because, in the Company's judgment, the operating segments have similar historical economic characteristics and are expected to have similar economic characteristics and similar long-term financial performance in the future. The principal measures and factors the Company considered in determining whether the economic characteristics are similar are gross margin percentage, operating profit margin, sales growth, capital expenditures, competitive risks, operational risks and challenges, retail store sales, costs of goods sold and employees. In addition, each operating segment has similar products, similar production processes, similar types of customers, similar methods of distribution and a similar regulatory environment. The Company believes that disaggregating its operating segments would not provide material or meaningful additional information." Safeway made the same representations concerning the aggregate operation of its operating segments in its 10k reports of 2009, 2010, 2011, 2012, 2013 and 2014.

23.     Most of Defendant's stores include a pharmacy department. As of December 31, 2013, Defendant operated 1041 pharmacies across 20 states and the District of Columbia. The polices, practices, and procedures for all of Defendant's pharmacies are centrally managed and controlled by Defendant's national Corporate Pharmacy Administration and upper corporate

management, including sales, pricing, promotions, billing, dispensing, reimbursement, claims

adjudication, safety standards, drug utilization review, and regulatory compliance.

24.     Defendant's Corporate Pharmacy Administration uses integrated pharmacy

information systems, programs, and transaction software to manage its pharmacies across

banners and states. The information systems are used for, among other things, pricing, drug

utilization review and claims adjudication. Pharmacy pricing files for all Defendant's banners are

directed, controlled, and maintained by Defendant's Corporate Pharmacy Administration, and

only through the central administration can drugs be added to the system or prices changed in the

system. All of Defendant's prescription transactions are transmitted in real-time for third party

adjudication or cash sale processing through the Defendant's centralized claims adjudication

system.

25.     Defendant's integrated pharmacy information system also keeps track of

historical customer information and enables customers to refill prescriptions in any of

Defendant's stores throughout the country.

26.     Through a single common application form, customers joined Defendant's

prescription benefits club (also "Generic Drug Program") and received a "club card" valid at all

of Defendant's pharmacies.

27.     Defendant's Generic Drug Program was a uniform scheme to defraud GHPs that

was rolled out in stages across the country. This program was eventually made available at "All

Safeway Company pharmacies" (including Safeway subsidiaries operating under different

banners) across the country, though the dates of implementation varied for groups of Safeway

banners and states.

28.      For example, Safeway implemented its Generic Drug Program (with more than 300 discounted generic drugs available) at Dominick's in Illinois in June 2008.

29.      Defendant's customers also registered online with Defendant's Pharmacy Prescription Management Application program and thereby accessed and used all of Defendant's Pharmacy Prescription Management Applications. Defendant's Pharmacy Prescription Management Applications' "Terms of Use" explicitly defined "Safeway" as "Safeway Inc. pharmacies, [including]the following Safeway affiliated banner pharmacies: Vons, Pavilions, Randalls, Tom Thumb and Carrs." Through Defendant's Pharmacy Prescription Management Application customers could order prescription refills online and have them filled at any of Defendant's pharmacies across the nation.

### B.      Relator

30.      Relator Thomas Proctor is a citizen of the United States and a resident of the State of Texas. Relator holds a BS in Pharmacy and Masters in Healthcare Administration and is a licensed pharmacist in the States of Texas, Oklahoma, Arkansas, Louisiana, Kentucky, Virginia, Arizona and Nebraska. Relator has knowledge of, and experience in, the retail pharmacy industry through his many years of working as a pharmacist.

31.      Relator was employed as a pharmacist at Safeway's Tom Thumb #3625 in Grapevine, Texas between June and October of 2011.

### III.      JURISDICTION AND VENUE

32.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3730(b). This court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a). This court also has supplemental jurisdiction over the state law claims under 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367.

33.     Venue in this Judicial District is appropriate under 31 U.S.C. § 3732(a) because the Defendant committed acts proscribed by 31 U.S.C. § 3729 in this Judicial District. The material events pled here include Safeway causing the submission of false Illinois Medicaid claims, which are processed in this Judicial District in Springfield, Illinois.

## IV.     PUBLIC DISCLOSURE, ORIGINAL SOURCE, AND RELATED PROCEEDINGS

34.     Prior to the filing of this action, Relator served a copy of the complaint and a written disclosure of substantially all material evidence and information he possessed on the United States and on the Plaintiff States.

35.      Relator believes that there  has been no prior public disclosure of the allegations and transactions on which this action is based; but should the question arise, and should the court determine otherwise, Relator is an original source of the information on which the allegations and transactions in this complaint are based, as defined in 31 U.S.C. § 3730(e)(4)(B).

36.     To the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of filing of this action, as prohibited in 31 U.S.C. § 3730(b)(5), said factual allegations in common with allegations in the other pending action, which would cause this to be a related cause of action, are hereby expressly excluded from this action, but only to the limited extent necessary to avoid such preemption.

37.      To the extent that the court finds that the allegations or transactions set forth herein are based upon allegations or transactions which are the subject of a federal civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, and the Government does not oppose the dismissal, then the allegations or transactions referred to herein that the court deems are based upon allegations or transactions which are the subject of any such civil suit or administrative civil money penalty proceeding are expressly excluded, but only for the specific time periods, specific companies,

and specific allegations or transactions as necessary and only for those allegations or transactions for which the Court determines Relator is not an original source.

## V.    GENERAL BACKGROUND INFORMATION CONCERNING GOVERNMENT-FUNDED PRESCRIPTION DRUG BENEFITS

38.    Federal and state GHPs, including Medicare, Medicaid, TRICARE (including "CHAMPUS," the Civilian Health and Medical Program of the Uniformed Services), and the Federal Employees Health Benefits Program ("FEHBP"), among others, offer pharmaceutical benefits to their respective beneficiaries. These programs do not buy drugs; instead, they reimburse providers who dispense covered drugs to program beneficiaries.

39.    The Medicaid, TRICARE, and FEHBP programs cap the reimbursement payable to pharmacy providers at the providers' usual and customary or "U&C" prices. Third-party payers such as private insurance companies are generally excluded from U&C calculations, making the U&C price equal to the amount cash customers pay for the drug. Instead of U&C prices, Medicare regulations require Part D beneficiaries be offered "Negotiated Prices" "reduced by those discounts" or "other price concessions" available at the "point of sale."

40.    As explained below, GHP prescription drug reimbursement rules for Medicaid, TRICARE, and FEHBP prohibit pharmacy providers, such as Defendant, from being reimbursed for drugs at amounts greater than what the providers otherwise charge members of the general public, known as their U&C price. "Negotiated Prices" impose a similar ceiling on Medicare reimbursements. The purpose of these price regulations is to ensure that GHPs do not pay more for prescribed drugs than what the GHP beneficiary would have paid had the beneficiary not been covered by a GHP.

41.    GHPs reimburse providers such as Defendant for prescriptions dispensed to program beneficiaries at the *lesser* of:

a.  the pharmacy provider's U&C price; or

b.  negotiated price; or

c.  one or more alternative price types ("APT" in the singular, and "APTs" in the plural, form).[2]

42.  With respect to GHPs with reimbursement methodologies that provide for the payment of the lesser of U&C price or an APT, the GHP compares the provider's submitted U&C price with no dispensing fee against the APTs, each APT consisting of both the ingredient cost and a dispensing fee, and reimburses the provider the lesser of the provider's U&C or APT.

43.  For purposes of the allegations contained in this Amended Complaint, the reimbursement methodologies for different GHPs are functionally equivalent. Accordingly,

---

[2] Examples of APTs included in GHP reimbursement methodologies, which are used as the basis for reimbursement when an APT is lower than the pharmacy's reported U&C price, are as follows:

a.  Estimated Acquisition Cost ("EAC"), plus Dispensing Fee. EAC is a State Medicaid agency's estimate, calculated according to the agency's established rules and regulations, of the price generally and currently paid by providers, e.g., pharmacies, for a drug marketed or sold by a particular manufacturer or labeler;

b.  Federal Upper Limit ("FUL"), plus Dispensing Fee. Federal Medicaid regulations establish an upper limit on the amount State Medicaid programs may pay for certain multiple-source drugs, that is, a brand name drug available in generic form or under a different brand name; or

c.  Maximum Allowable Cost ("MAC"), plus Dispensing Fee. State Medicaid agencies also had and have the discretion to establish State upper limits on drugs.

As indicated, APTs consist of two components. The first component, the EAC, MAC, or FUL, is intended to reimburse the ingredient cost of a drug. The second component, the dispensing fee, is intended to reimburse the pharmacy for pharmacy operation costs, including, but not limited to, costs associated with a pharmacist's time in checking the computer for information about an individual's coverage, performing drug utilization review and preferred drug list review activities, measuring or mixing the covered outpatient drug, filling the container, counseling the beneficiary, physically providing the completed prescription to the Medicaid beneficiary, delivery, special packaging, and overhead associated with maintaining the facility and equipment necessary to operate the pharmacy.

Safeway's fraudulent conduct will at times be generically referred to as the "U&C" fraud

scheme, which includes pricing fraud affecting Medicaid, TRICARE, FEHBP, and Medicare.

44.     Truthful determination and reporting of the U&C or Negotiated Price by the

pharmacy provider is a material component of the GHP's payment calculation. When a

dispensing pharmacy knowingly charges above the U&C or Negotiated Price to GHP

beneficiaries, the reported pricing information is fraudulent since the lower U&C or Negotiated

Prices were not provided to the GHPs.

> **A.  Specific GHP Prescription Drug Methodologies Illustrating the Established,
> Well-Known Understanding and Application of U&C Price**
>
> **1.  Medicaid**

45.     Medicaid is a joint and voluntary program between the federal government and

the states, whereby low-income, disabled and elderly individuals are offered basic healthcare

coverage, including prescription drug benefits. The Federal government pays a share of the

medical assistance expenditures under each state's Medicaid program. That share, known as the

Federal Medical Assistance Percentage ("FMAP") or the Federal Financial Participation

("FFP"), is determined annually by a formula that compares the State's average per capita

income level with the national income average. States with a low per capita income level are

reimbursed at a higher percentage share of their costs than states with a high per capita income

level. By law, the FMAP cannot be lower than 50 percent or higher than 83 percent.

46.     Federal Medicaid regulations limit Pharmacy reimbursement to the "lower of the

(1) EAC [Estimated Acquisition Cost] plus reasonable dispensing fees established by the agency;

or (2) Providers' usual and customary charges to the general public." 42 C.F.R. § 447.512. The

State Medicaid U&C regulations all flow from this requirement and all State plans must

periodically determine that they "are in accordance with § 447.512." 42 C.F.R.

§ 447.518(b)(1)(ii).

47.     Since at least 1976, the Medicaid rules have divided reimbursable drugs into two

categories: i) multiple source drugs subject to a Federal Upper Limit (FUL), and ii) other drugs.

Multiple source drugs can be subject to a FUL or Maximum Allowable Cost (MAC) when there

are multiple equivalent drugs and suppliers. *See* 42 C.F.R. § 447.514 (formerly § 447.332).

"Other drugs" include single-source drugs, certified brand drugs (which require the physician to

certify the medical necessity for use of brand name drugs), and multiple source drugs for which a

FUL or MAC has not been established. *See* 42 C.F.R. § 447.512.

48.     During the same time period, Medicaid rules have provided that State agency

payments for other drugs must not exceed, in the aggregate, payment levels the agency has

determined by applying the lower of the following costs and charges:

> a.  EAC plus a reasonable dispensing fee established by the agency; or
>
> b.  The provider's usual and customary charges to the general public.

49.     Reimbursement methodologies in all States identified in Paragraphs 8 and 9

compare, and in all cases limit, reimbursement to the lowest of U&C, EAC, MAC (if any), and

FUL (if any). Accordingly, the relevant Medicaid reimbursement methodology for all covered

drugs can be summarized to provide for the payment of the *lesser* of the following costs, charges,

or limits:

> a.  The provider's usual and customary charge to the general public;
>
> b.  EAC plus a reasonable dispensing fee established by the State agency;
>
> c.  State MAC, if any, plus a reasonable dispensing fee; or
>
> d.  FUL, if any, plus a reasonable dispensing fee.

50.     Individual State Medicaid programs define the U&C charge to the "general public" in a variety of ways but the purpose of all U&C definitions is clear: GHPs are not to pay more for prescribed drugs than the prevailing retail market price, and pharmacies must reduce their U&C price for a given prescription to include any discounts the pharmacy would have given the Medicaid recipient if the recipient had not been covered by Medicaid. **Exhibit A** provides a summary of the GHP U&C definitions at issue in this action.

51.     All of the individual State U&C definitions require that pharmacies at least offer GHP beneficiaries the same cash prices otherwise offered to the general population, including any discounts offered at the point of sale. Certain U&C definitions additionally require that GHP beneficiaries be offered the lowest price offered to anyone, or that U&C calculations include third party payers.

52.     In all cases, pharmacy providers are legally obligated to accurately determine and report their true U&C prices according to the applicable Medicaid reimbursement methodology when submitting claims to a particular Medicaid program for payment.

### 2.  TRICARE

53.     TRICARE is the managed health care program established by the Department of Defense ("DoD") for active duty service members and their families, retired service members and their families, and certain other eligible beneficiaries.

54.     TRICARE reimbursements for prescription drugs are limited to the "the usual and customary retail price of a Covered Medication in a cash transaction . . . inclusive of 'loss leaders', frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member . . . Additionally, the Usual and Customary Retail Price must include any applicable discounts offered to attract customers . . . ." TRICARE Express Scripts

Pharmacy Manual.

55.     Since June 1, 2004, Pharmacy Benefit Manager ("PBM") Express Scripts has operated the TRICARE Retail Pharmacy contract for all TRICARE beneficiaries located in the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and Guam, except for beneficiaries enrolled in one particular plan which is not material to this action.

56.     Pursuant to the 2005 Express-Scripts pharmacy manual, Express Scripts' TRICARE reimbursement methodology was based on the lower of:

    a.  Average Wholesale Price ("AWP")[3] less the contracted discount baseline price (as calculated by First DataBank),[4] less the contracted discount for the specific network; or

    b.  MAC or submitted cost plus the contracted dispensing fee for that network; or

    c.  U&C.

57.     The 2005 Express-Scripts pharmacy manual defined "Usual and Customary Retail Price (U&C)" as "[t]he usual and customary retail price of a Covered Medication in a *cash* transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, *including any discounts* or special promotions offered on such date." (Emphasis added).

58.     Pursuant to the 2013 Express-Scripts pharmacy manual, Express Scripts' TRICARE reimbursement is based on the following methodologies:

    a.  For Single-Source Brand Drugs, reimbursement is the lesser of:

---

[3] AWP is a benchmark used for pricing and reimbursement of prescription drugs for both government and private payers.

[4] First Data Bank ("FDB") provides integrated drug database products and is one of several commercial drug pricing compendia which compile and publish benchmark prices such as AWP suggested by drug manufacturers for their products.

      i. AWP ingredient cost minus contracted brand discount plus contracted brand dispensing fee for the applicable network; OR

      ii. Network Provider submitted brand ingredient cost plus contracted brand dispensing fee; OR

      iii. Usual and Customary Retail Price; OR

      iv. If applicable, specific Sponsor reimbursement; OR

      v. State Fee Schedule (e.g., Workers' Compensation).

b. For Generic Drugs or Multi-Source Brand Drugs, reimbursement is the lesser of:

      i. AWP Generic Drugs or Multi-Source Brand Drugs ingredient cost minus contracted Generic Drug discount plus contracted Generic Drug dispensing fee for the applicable network; OR

      ii. MAC discount plus contracted Generic Drug dispensing fee for the applicable network; OR

      iii. Network Provider-submitted ingredient cost plus contracted Generic Drug dispensing fee for the applicable network; OR

      iv. Usual and Customary Retail Price; OR

      v. If applicable, special Sponsor reimbursement logic; OR

      vi. State Fee Schedule (e.g., Workers' Compensation).

59.  The 2013 Express-Scripts pharmacy manual defines "Usual and Customary Retail Price (U&C)" as follows:

> To the extent no [sic] defined in the Provider Agreement, Usual and Customary Retail Price means the usual and customary retail price of a Covered Medication in a *cash* transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, *inclusive of 'loss leaders', frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts,* special promotions, and programs causing a reduction in the price offered to that Member and offered by the Network Provider (or any of its Pharmacies) on such date. Additionally, the Usual and Customary Retail Price must *include any applicable discounts offered to attract customers including Members.*

(emphasis added).

### 3. FEHBP

60.  The FEHBP offers comprehensive group health insurance to federal employees, retirees and their eligible family members through a wide variety of qualified carriers and plans approved by the U.S. Office of Personnel Management ("OPM").

61.  FEHBP reimbursements are limited to "the lowest price Provider would charge a

particular patient if such patient were paying cash for an identical prescription on that particular

day at that particular location. This price must include any applicable discounts offered to attract

patients." FEHBP's CVS/Caremark Pharmacy Manual.

62.     Since at least 2006, FEHBP plans have been PBM CVS/Caremark's largest

customers (the reference to "Caremark" includes its successor "CVS/Caremark"). The majority

of FEHBP claims are processed by CVS/Caremark.

63.     Pursuant to the Caremark 2007 and 2009 manuals, FEHBP prescription drugs

provided to its members have been reimbursed at the lower of:

    a. Price Type plus or minus the applicable percentage of the Price Type, plus the
applicable Dispensing Fee, less the applicable Patient Pay Amount (or if the
applicable Price Type is unavailable for a given drug, Caremark will pay Provider
based upon AWP minus the applicable AWP Discount, plus the applicable
Dispensing Fee, minus the applicable Patient Pay Amount);

    b. MAC plus the applicable Dispensing Fee, less the applicable Patient Pay Amount;

    c. Ingredient cost submitted by Provider, plus the applicable Dispensing Fee, less
the applicable Patient Pay Amount; or,

    d. Provider's U&C price less the applicable Patient Pay Amount.

64.     The 2007 and 2009 manuals define "Usual and Customary Price or U&C" as "the

lowest price Provider would charge a particular patient if such patient were paying *cash* for an

identical prescription on that particular day at that particular location. *This price must include*

*any applicable discounts offered to attract patients.*" (Emphasis added).

### 4.  Medicare Part D Voluntary Prescription Drug Benefit Program

65.     The voluntary prescription drug benefit program for Medicare

enrollees/beneficiaries is known as Medicare Part D ("Part D"). Part D was enacted into law on

December 8, 2003 and became available to beneficiaries beginning on January 1, 2006.

66.     Medicare Part D reimbursements are limited by Negotiated Price, which is the

18

amount the provider will receive, in total, for a particular drug. These Negotiated Prices must be reduced by discounts or other price concessions available at the point of sale.

67.    Unlike Medicaid, TRICARE, and FEHBP, coverage for the Part D drug benefit is provided under private prescription drug plans ("PDP" in the singular, and "PDPs" in the plural, form). Medicare contracts with private entities, known as PDP "sponsors," to administer prescription drug plans. PDP sponsors do not utilize the same lesser of U&C or APT reimbursement methodology previously discussed, but the underlying principle behind the Part D benefit design reimbursement methodology is the same; namely that Medicare should receive the benefit of all discounts, subsidies, rebates, and other price concessions available to cash paying customers at the point of sale.

68.    Federal regulations require that PDP sponsors provide Medicare and Medicare beneficiaries with access to the PDP sponsors' "Negotiated Prices" for covered Part D drugs as part of their qualified prescription drug coverage. 42 CFR § 423.104(g)(1).

69.    Access to Negotiated Prices must be provided, but it may be provided by the PDP sponsor directly or through arrangements with other entities. 42 CFR § 423.104. Therefore the Negotiated Price limit on Medicare Part D reimbursements to PDP sponsors, PBMs, and providers such as pharmacies is set by federal regulation. Though this limit on PBM and pharmacy reimbursement may be enforced through contractual arrangements between PDP sponsors and downstream entities, it is not *set* by those contracts.

70.    Negotiated Prices are prices for covered Part D drugs that: (1) the Part D sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network dispensing provider have negotiated as the amount such network entity will receive, in total, for a particular drug; (2) are reduced by those discounts, direct or indirect subsidies,

rebates, other price concessions, and direct or indirect remuneration that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale; and (3) include any dispensing fees. 42 CFR § 423.100.

71.     Access to Negotiated Prices must be provided to Medicare and Medicare beneficiaries even when no benefits are otherwise payable on behalf of a beneficiary due to the application of a deductible or other cost-sharing.

72.     Under Part D PDP sponsor plans, if a pharmacy provider's U&C price for a specific drug is less than a PDP sponsor's Negotiated Price, the PDP Plan considers the discounted U&C price to take the place of the Negotiated Price. By way of example, assume the Negotiated Price of a drug is $10 with a beneficiary co-pay of 25%. If the pharmacy provider offers the same drug for $4, the PDP sponsor considers the $4 to take the place of the $10 Negotiated Price. The PDP sponsor will adjudicate the claim for $4 and the beneficiary will pay only a $1 co-pay rather than a $2.50 co-pay. Consequently, Medicare, the PDP and the beneficiary benefit from the pharmacy provider's discounted U&C price under the Medicare Negotiated Price regulations.

73.     A failure to offer Medicare Negotiated Prices is a violation of Part D regulations and occurs when a pharmacy provider charges a higher amount, such as failing to offer Medicare or Medicare beneficiaries available discounts or price concessions at the point of sale. When the dispensing pharmacy improperly charges more than the Negotiated Price, that reported pricing information is deemed inaccurate since the Negotiated Prices were not provided to Medicare.

74.     When a pharmacy provider dispenses drugs to a Medicare beneficiary, the pharmacy submits an electronic claim to the beneficiary's PDP sponsor or an intermediary called a Pharmacy Benefit Manager ("PBM"), and receives reimbursement from the PDP sponsor or

PBM for costs not paid by the beneficiary (co-payment).

75.     Payments to PDP sponsors from the Centers for Medicare & Medicaid Services ("CMS") are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program. The PDP sponsor must submit a summary record called the prescription drug event (PDE) to CMS. The PDE record includes data elements about the drug dispensed, the prescription, and information about the payment to the pharmacy.

76.     Throughout the year, CMS makes prospective payments to PDP sponsors for three subsidies based on the sponsors' approved bids: (1) the direct subsidy designed to cover the sponsors' costs of providing the benefits; (2) the low-income cost-sharing subsidy; and (3) the reinsurance subsidy.

77.     CMS uses submitted PDE data to reconcile monthly subsidy payments made to PDP sponsors with actual program cost data. CMS relies on this data to determine the PDP sponsors' actual allowable costs.

78.     After the close of the plan year, CMS reconciles the prospective payments made to PDP sponsors with the PDP sponsors' actual allowable costs to calculate final payments and risk sharing amounts.

79.     PDP sponsors who fail to submit accurate claims-level information contained in the PDEs to CMS risk having to return monthly payments to CMS during reconciliation.

80.     The current Part D benefit infrastructure, however, does not provide CMS real time access to Part D point-of-sale and plan data to determine: i) whether PDE records submitted by PDP sponsors are accurate; or ii) whether pharmacy provider claims were adjudicated in accordance with the PDP sponsors' plan design, including whether the beneficiary was offered the benefit of an available discount at the point of sale. As a result, CMS may not detect

inaccurate PDE records or instances where sponsors are adjudicating claims improperly and, in particular here, whether the provider offered and adjudicated the claim considering the provider's U&C discount price. CMS is dependent on PDP sponsors and their pharmacy providers to adjudicate claims accurately according to PDP sponsors' plan designs and to provide CMS with accurate and valid PDE data.

81.     PDP Sponsors and their subcontractors such as Safeway are obligated by federal regulations to certify the accuracy, completeness, and truthfulness of all data related to the payment, including data elements submitted by plan sponsors in their PDE records.

82.     Safeway, as a subcontractor for PDP sponsors, is required to comply with all applicable federal laws, regulations and CMS instructions, which include the obligation to offer Medicare beneficiaries available discounts or price concessions to Negotiated Prices at the point of sale. Moreover, PDP sponsors and their subcontractors that generate claims data are obligated by federal regulation to certify the accuracy, completeness and truthfulness of all data related to payment:

> **(1)** *General Rule.* As a condition for receiving a monthly payment . . . the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.

> **(2)** *Certification of enrollment and payment information*. The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.

42 C.F.R. § 423.505(k)(1) & (2).

83.     The "Certification of data that determines payments" provision of the applicable regulation further provides that "[i]f the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

84.     The certification of data as accurate, complete, and truthful required by 42 C.F.R. § 423.505(k) is a condition of payment for PDP sponsors and for their subcontractors.

85.     The failure to offer Medicare beneficiaries Negotiated Prices that reflect point of sale discounts and price concessions results in requests for payment from pharmacies to PBMs and PDP sponsors with inflated Negotiated Prices.

86.     Pharmacies that submit claims data with inflated Negotiated Prices that do not reflect point of sale discounts and price concessions are submitting false claims for payment.

87.      The failure to offer Medicare beneficiaries Negotiated Prices that reflect point of sale discounts and price concessions also renders the annual certifications from the PDP Sponsors and their subcontractors required by 42 C.F.R. § 423.505(k)(3) false.

88.     Safeway's actions in reporting inflated Negotiated Prices for drugs dispensed to Medicare beneficiaries caused the PDP sponsors to submit false and fraudulent claims for payment to CMS.

89.     Safeway's false certifications of inaccurate claims data likewise caused the PDP sponsors to submit false and fraudulent claims for payment to CMS.

90.     Falsely inflated Negotiated Prices also cost the Government more money. Increasing the PDP's pharmacy benefit costs can lead to higher reconciliation payments from the

Government in the year that the fraud took place because CMS set up risk corridors to mitigate potential losses by the PDPs. And increased pharmacy benefit costs will lead to higher bids from PDPs for providing Medicare Part D coverage in subsequent years, raising the per-person Medicare Part D direct subsidy that CMS pays to all PDPs for providing such coverage.

## VI.   HISTORICAL PERSPECTIVE OF PRESCRIPTION DRUG U&C PRICING AND THE EMERGENCE OF PHARMACY DISCOUNT DRUG PROGRAMS

91.     Historically, as today, GHP and private insurer drug reimbursement methodologies typically have provided for the payment of the lower of U&C price or one or more APTs.

92.     Retail pharmacies, in response, historically set U&C prices to cash customers at amounts far exceeding corresponding APT prices, in the absence of competitive pressures. This was because the GHP and private insurer transactions had always greatly outnumbered sales to cash customers by a multiple factor and, as a consequence, setting U&C prices below the highest available APTs would have resulted in significant loss of revenue to a pharmacy.

93.     For these reasons, pharmacies were rarely reimbursed by GHPs and private insurers at the retail pharmacies' historically high, every day U&C prices to cash customers. Retail pharmacies were virtually always reimbursed at the lower APT reimbursement formula rates.

94.     The historical U&C pricing model underwent a drastic, game-changing makeover shortly after the January 1, 2006 implementation of Medicare Part D prescription drug coverage.

95.     Beginning in approximately May 2006, Kmart and Wal-Mart introduced and popularized the first discount generic drug programs for pharmacy customers. Kmart initially offered 90 count supplies of some 300 generic maintenance drugs at commonly prescribed dosages for $10, $15 or $25; and a 30 count supply of select acute drugs for $5. By the late fall

of 2006, Wal-Mart had established a nationwide discount program which offered 30-count

supplies of more than 300 drugs for $4. Before the end of 2006, Kmart had expanded its 30-

count discount program to compete with Wal-Mart.

96.    By late 2006 or early 2007, in an effort to retain their customers, many other

pharmacy chains, including Target and Kroger, instituted competitive discount drug programs.

Most national pharmacy chains now offer a formulary of 30-count drug supplies for

approximately $4 and 90-count supplies for approximately $10 or $15 or price match these

programs.

97.    In addition, many pharmacy chains also offer across the board percentage or other

discounts on non-formulary generics and select brand drugs.

98.    Instead of having their own formulary or discount program, some pharmacy

chains started programs that offered to price match Wal-Mart's or other competitors' discount

prices, including their competitors' percentage discounts on non-formulary generics and

discounts on select brand drugs.

99.    As a result of the emergence of these discount drug programs, hundreds of

commonly prescribed drugs are now sold across the nation, every day, at deeply discounted

prices, counter to the historical U&C pricing model. These new, deeply discounted prices result

in U&C prices that are materially below the Part D Negotiated Prices and APTs. This is the post-

2006 U&C pricing model.

100.    For claims submitted to GHPs, pharmacies are legally obligated to report their

discount U&C prices and/or include the discounts in the calculation of their U&C and Negotiated

Prices for purposes of reimbursement. GHPs are not to pay more for prescribed drugs than the

prevailing retail market price, and pharmacies must provide GHP beneficiaries any discounts the

pharmacy would have offered had the customer not been covered by a GHP.

101.    Unlike Safeway, Wal-Mart properly reported the $4 cash prices to GHPs as its U&C, thereby according GHPs the benefit of the same discounted prices extended to the general public as intended by GHP reimbursement rules.

102.    In 2006, within months after the Wal-Mart program was launched, CMS issued a Memorandum to all Medicare Part D sponsors confirming that pharmacies' discounted prices constituted the pharmacies' U&C and Negotiated Prices and must be offered as part of the GHPs' benefit design thereby allowing GHPs to share in the significant savings on drugs enjoyed by the general public as intended by GHP reimbursement rules. This October 11, 2006 memorandum addressed to all Part D sponsors from the CMS Director of the Medicare Drug Benefit Group confirmed that everyday, reduced prices are considered a pharmacy's U&C prices under the Part D benefit design. In this respect the memo stated as follows:

> We note that in cases where a pharmacy offers a lower price to its customers throughout a benefit year, this would not constitute a 'lower cash price' situation that is the subject of this guidance. For example, Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's 'usual and customary' price, and is not considered a one-time 'lower cash' price. Part D sponsors consider this lower amount to be 'usual and customary' and will reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit for $4. The Plan considers the $4 to take the place of the $10 negotiated price. The $4 is not considered a lower cash price, because it is not a one-time special price. The Plan will adjudicate Wal-Mart's claim for $4 and the beneficiary will pay only a $1 copay, rather than a $2.50 copay. This means that both the Plan and the beneficiary are benefitting from the Wal-Mart 'usual and customary' price, and the discounted Wal-Mart price of the drug is actually offered within the Plan's Part D benefit design. Therefore, the beneficiary can access this discount at any point in the benefit year, the claim will be adjudicated through the Plan's systems, and the beneficiary will not need to send documentation to the plan to have the lower cash price count toward TrOOP ["true out of pocket cost deductible"].

103.    As awareness of the low cash prices increased, State Medicaid programs, TRICARE and FEHBP likewise sought early on to remind providers through guidance and

regulations that U&C prices were always intended to be reflective of actual market prices and that U&C prices had to reflect discounts offered at the point of sale. Like Part D Negotiated Prices which must be "reduced by those discounts" or "other price concessions" available at the "point of sale," Express Scripts (TRICARE) and CVS/Caremark (FEHBP) reimbursement manuals expressly required providers to include such discounts in their calculations of U&C price for purposes of reimbursement under those GHPs. Various State Medicaid programs issued similar guidance to providers affirming that offered discounts under Wal-Mart styled discount programs were to be included in the provider's U&C price for purposes of calculating reimbursement.

## VII.   DEFENDANT'S U&C PRICE FRAUD

### A.  Summary Description of Unlawful Acts

104.    Beginning in or about 2007, Safeway, through the pharmacies it operates, manages, controls, and/or owns, knowingly perpetrated a multi-faceted false U&C pricing fraud scheme against GHPs as corporate company policy. In order to stay competitive and attract customers, Safeway created and publicly promoted a series of prescription drug discount programs. These programs were rolled out nationwide and across all Safeway banners and offered deep discounts on prescription drugs.

105.    Beginning in or about 2007, Safeway offered a discount drug formulary of approximately 300 drugs sold at $4 for a 30 days' supply, $8 for a 60 days' supply, and $12 for a 90 days' supply. Safeway also offered to match prices for drugs on Wal-Mart's or other competitors' discount lists. In addition, Safeway also created a "membership club" that was free to join that offered across the board percentage discounts of 10% off ALL branded medications and 20% off ALL non-formulary generics.

106.    As a consequence of these actions by Safeway, virtually all drugs sold by

Safeway were offered at everyday deep discount prices nationwide and across all of Safeway's brands.

107.     Safeway's corporate promotional materials explicitly stated that the offered "Discounts and Incentives are not available to patients whose prescriptions are paid in whole or part by Medicare, Medicaid or other federal health care programs." However if the customers' co-payment exceeded the discount price and the customer asked for the discount, then the transaction was sometimes reprocessed as a cash transaction, though Safeway policy was to normally process prescriptions through GHP insurance, reporting the inflated U&C price when possible to obtain the higher reimbursement.

108.     GHP reimbursement rules and regulations prohibit pharmacy providers from being reimbursed at amounts greater than what they otherwise charge members of the general public and GHP prescription drug reimbursement rules require that discounts offered to the general public at the point of sale must also be provided to GHP beneficiaries. Safeway defrauded GHPs through a centrally-organized scheme, promoted across multiple states and banners, that was knowingly and intentionally structured to avoid reporting Safeway's actual everyday low discount prices to GHPs as Safeway's required U&C prices, materially causing GHPs to overpay claims.

109.     Through its centralized policies and its centrally-managed, interconnected computer system, Safeway set and dictated to its subsidiaries the actual low price of discounted drugs that were offered to the general public as well as the falsely inflated prices that were reported to GHPs for the same drugs.

110.     Safeway knowingly submitted and caused to be submitted falsely inflated claims for reimbursement to GHPs for all pharmacies it controlled through a centrally-managed,

interconnected computer claims processing system.

111.     Defendant has submitted and caused to be submitted (to the federal and state governments, GHPs, PBMs, and PDPs) many thousands of false claims for prescriptions filled for GHP beneficiaries across the nation, based on the public promotions of its national discount program, the number of pharmacies it operates, the number of drugs involved, the number of GHP prescription drug transactions at each pharmacy, and the relevant time period which began as early as 2007 and continues to the present.

**B.     Defendant's Discount Drug Programs**

112.     Beginning no later than 2007, Safeway was facing competition for pharmacy customers from traditional grocery retailers, from non-traditional competitors such as supercenters and club stores and from specialty supermarkets and drug stores. Safeway and its competitors engaged in price competition, which adversely affected Safeway's operating margins in its markets.

113.     In 2008, Wal-Mart began expanding its 2006 discount drug program to include discounts on many additional drugs, including more expensive drugs which it sold at $9 for a 30 days' supply.

114.     Faced with increasing competition from Wal-Mart, Kmart, and other pharmacies offering discount drug programs, in or around 2007-2008 Defendant began offering its own discount programs across its banners in the various states in which it operated, including: price matching; an automatic $4 generic program; and, a membership club discount program. Due to the magnitude of the project, it was rolled out over time across banners and states. Defendant characterized its discount drug programs as point of sale discounts, not insurance. Terms and conditions of the offers were provided in stores and posted on its various banner websites.

115.     Defendant first offered, across its banners and in multiple states, to price match

any competitors' price for a prescription drug, most notably those on the Wal-Mart list. In price match situations, Defendant would honor the lower price to its customer, but would still submit its higher U&C price to GHP insurance and collect an inflated claim from the GHP.

116.    In or around June 2008, Defendant announced, promoted, and launched in its East Coast and Midwest banners, an automatic $4 discount drug program modeled after the Wal-Mart program. The announcement was widely publicized in newspapers across the nation including the Washington Post, Wall Street Journal, and Chicago Tribune as well as industry publications such as Supermarket News. Defendant offered a formulary of approximately 300 generic drugs priced at $4 for a 30 days' supply, $8 for a 60 days' supply, and $12 for a 90 days' supply. The formulary discount list and terms of the discounts offered were published and publicly available. Lists were distributed by pharmacies to customers and were available on Defendant's banner websites. Defendant continued to offer to price match any competitors' price for a prescription drug not on its formulary list. No enrollment or membership was required. All customers automatically received the Defendant's reduced formulary pricing. In price match situations, however, Defendant would honor the lower price to its customer but would submit its higher U&C price to GHP insurance and collect an inflated claim from the GHP. The automatic $4 program was rolled out over time to Defendant's other pharmacies, including its Texas Randalls and Tom Thumb banners as well as subsidiaries in other states.

117.    Also in 2008, Defendant began offering across Western states a free pharmacy "membership club" program that price matched competitors' prices, again offering: a formulary of approximately 300 generic drugs priced at $4 for a 30 days' supply, $8 for a 60 days' supply, and $12 for a 90 days' supply; across-the-board percentage discounts of 10% off ALL branded medications; and, 20% off ALL non-formulary generics. The formulary discount list and terms

of the discounts offered were published and publicly available. Lists were distributed by pharmacies to customers and were available on Defendant's banner websites. The only requirement for membership in Defendant's pharmacy club was to fill out the membership enrollment form which asks for the customer's name, address, phone number, email address, date of birth, and number of dependents. The pharmacy club membership was added as a benefit to customers' existing grocery club card. Defendant promoted the membership programs to customers without insurance or insufficient insurance coverage, but it did not offer GHP beneficiaries or other third party payers the benefit of the discount prices unless their co-payment exceeded the discount price and the customer asked for the lower price, in which case the transaction was sometimes reprocessed as a cash transaction, though Safeway policy was to run prescriptions through GHP insurance with an inflated U&C price when possible to obtain the higher reimbursement.

118.    In or about July 2010, Defendant discontinued the automatic $4 generic program in the places it operated, and replaced it with Defendant's membership club program which was also available to the general public. To continue receiving the discounts customers were required to join the no-cost club. In addition to the price matching and $4 discounts customers had already been receiving in the automatic $4 program, club members received the same 10% discounts on all brand name drugs and the 20% discounts on all non-formulary generic drugs. Again, Defendant did not offer GHP beneficiaries or other third party payers the benefit of the discount prices unless their co-payment exceeded the discount price and the customer asked for the lower price.

119.    The $4 generic program and the membership club were part of a centrally-organized scheme that Safeway knowingly and intentionally structured to avoid offering and

reporting its actual everyday low discount prices to GHPs, materially causing GHPs to overpay claims. After the transition from the $4 program was complete, virtually all of Defendant's pharmacies nationwide operated under the membership program where cash customers were offered discount prices but GHP beneficiaries were offered inflated prices, unless their co-payment exceeded the discount price and the customer asked for the lower price. Through its computer systems, Defendant submitted the same fraudulent U&C price information to all GHPs, including Medicare, TRICARE, FEHBP and State Medicaid programs, as part of a corporate-wide scheme to defraud GHPs. The "standard" price Defendant routinely submitted nationwide to GHPs for drugs, otherwise offered to cash customers at $4, was $11.99 (triple the actual U&C price).

120.    Defendant's corporate executives from the Chief Financial Officer ("CFO") down the corporate pharmacy administration chain of command understood and acknowledged that the sole purpose of the membership club program available to the general public (and the change to the membership program from the automatic $4 program) was to manipulate U&C in order to overcharge third party insurance, including GHPs.

121.    For those pharmacies operating under the Defendant's *automatic $4 discount plan*, Defendant understood that the $4 price was its U&C price. Even customers with GHP insurance were offered the $4 discount price. Defendant's computer systems were programmed by Defendant to adjudicate all formulary $4 drugs at $4. Defendant truthfully reported the $4 price as its U&C and claims were paid at $4. Customers with copays greater than $4 were automatically charged $4. In price match situations, however, Defendant would honor the lower price to its customer, but would submit its higher U&C price to GHP insurance and collect an inflated claim from the GHP.

122.    In an effort to avoid offering and reporting its everyday low discount prices to GHPs, Defendant discontinued its automatic $4 discount plan in favor of a membership club program.

123.    For those pharmacies operating under the *membership club program*, Defendant did not offer customers with GHP insurance the $4 price or the program's other offered discounts (price matching or 10% off brand and 20% off non-formulary generics) unless their co-payment exceeded the discount price and the customer asked for the lower price. Defendant did not truthfully report the discount prices or price matches as its U&C; and as a result claims were paid by insurance, including GHPs, at inflated prices.

124.    In 2009, Jose Alcaine, Safeway Corporate Pharmacy Category Manager, in Pleasanton, California, proposed an extension of the membership program fraud scheme to Michael Topf, Defendant's Director of Finance Pharmacy, Main Meals & Ingredients, and Jesse Talamantez, Director - Pharmacy Supply Chain & Category Management, Safeway Corporate Operations, as follows:

> Hypothetical: We pull the $4 programs in Texas, Eastern, Genuardi's and Dominick's and offer the same program; however, as a membership (FREE but customers need to sign up) program:
> 1. What is the current cost of the $4 program in the divisions mentioned above?
> 2. What is the potential savings if we make this a membership program? Thereby not affecting our insurance reimbursements.

125.     Mr. Alcaine performed the calculations with Defendant's Finance Department and reported back to Mr. Topf and Mr. Talamantez that by transitioning to membership for just the named divisions, Defendant would realize $8 million in savings per year:

> Current program cost:
> Dominick's - $150k per period x 13 periods = $1.95 million
> Eastern/Genuardi's - $300k per period x 13 = $3.90 million
> Texas - $320k per period x 13 = $4.15 million

Total cost = $10 million

If we change the plan to a membership program, the assumption is that only 20% of the $4 scripts are cash and these are the individuals who would sign up for the membership program. Based on this assumption the membership program would cost us $2 million thereby potentially saving us $8 million.

Mike,
Let me know, if I explained it correctly.

126.    Mr. Alcaine and Mr. Talamantez worked out the details of the scheme and reported back to Mr. Topf, explaining among other things that membership club "Discounts and Incentives are not available to patients whose prescriptions are paid in whole or part by Medicare, Medicaid or other federal health care programs." Defendant's upper corporate management clearly understood the intent and purpose of the transition to the membership program was to overcharge GHPs.

127.    In an email exchange between Mr. Topf and Brian Baer, Defendant's Chief Financial Officer ("CFO"), Mr. Topf explained the program details as follows:

[A]bout 40% of customers have copays under $4 to begin with so the hope is that these people definitely won't take us up on the $4 offer. Another 20% should have $5 copays so a large portion of them will essentially be indifferent."

128.    In response to Mr. Topf's email, Mr. Baer stated, "I am still a bit hazy on a few pts - as is Jeff.....look forward to discussing with you more....it seems like to me this whole thing revolves @ the insurance angle - to get the $10 per item from them vs the $4 cash price.....am I off?"

129.    Mr. Baer was not "off" and understood perfectly "this whole thing" was a scheme intended to overcharge customers' insurance, including GHPs.

130.    Mr. Topf told Mr. Talamantez that CFO Baer was asking for details and directed him to brief the CFO on the program.

131.    In 2010, Mr. Alcaine received approval from his corporate superiors to implement his proposal down the corporate chain of command:

> DO NOT COMMUNICATE TO DIVISIONS. This information is not public knowledge so please keep this quiet; however, we need to start working on the transition. Last night pharmacy received approval to stop the $4 program and transition to the Price Matching membership program.

132.    Mr. Alcaine, Mr. Talamantez and their corporate staff directed and supervised the transition from the automatic $4 program to the membership program with division heads, including Julie Spier, Director of Pharmacy Operations Texas, Steve Scalzo, Director of Pharmacy Operations Dominick's Pharmacy (Illinois), and the division heads for Defendant's Eastern, Genuardi's and other pharmacies that had not transitioned to the membership program. Once the transition was complete, virtually all of Defendant's pharmacies nationwide operated under the fraudulent membership program.

133.    As part of the implementation of the membership program, Mr. Alcaine directed that Defendant's corporate claims adjudication software be reprogrammed with the new higher U&C pricing for all pharmacies, transitioning from the $4 program to the membership program so GHPs and other insurance would not receive the discounted prices. Mr. Topf was informed of this.

134.    Ms. Spier explained the scheme in an email to her staff:

> [W]e are changing from the "automatic $4 generic list to a membership program (In order for the patient to get a $4 generic they will need to sign up for our new membership program). *We are going to this membership program to try to protect some of our gain dollars*. All of our plans reimburse using a contracted formula for reimbursement or our usual and customary whichever is less. If we have $4 generics, we automatically have to give all the insurance companies the $4 too. With the implementation - for each of the previous $4 generics the pharmacy will need to process first on the patients regular insurance to see what their copay is and if it is more than the $4 generics - the pharmacy will need to reverse the claim and then move it over to the membership. *This is very important so that we are able to put as much as we can back to the bottom line*." (emphasis added).

35

135.    Mr. Scalzo (the Illinois Director) also understood that the purpose of the transition to the membership program from the automatic $4 program was to manipulate U&C in order to overcharge third party insurance, including GHPs. Mr. Scalzo acknowledged that under the automatic $4 program: "We must transmit $4 as our usual and customary price to all third party agencies for these medications"; by converting to the membership program "we can now price these generics with 'standard' usual and customary prices which will be transmitted to most third party payors"; we can "offer membership at no charge to patients."

136.    Defendant's membership club program was deliberately structured to ensure that GHP beneficiaries would always pay the discount price or less if they "elect" for the lower price, but the Government, as third-party payer of the majority of the cost, would never receive the benefit of the discounts.

137.    In a 2008 email from Mr. Talamantez to Defendant's western state divisions explaining the membership club scheme, he noted that:

Q. What if a customer is on an insurance plan?
A. Based on the customer's current insurance co-pay for generics, a customer may elect to enroll in our membership program to get the better pricing. Once enrolled, if you are matching a generic price from a competitor, Complete the information in PDX, Override the price to match competitor, and Submit transaction online. using our membership program not primary insurance.

138.    Mr. Scalzo also understood that GHP beneficiaries would always pay the discount price or less if they "opt" to pay the lower price, but the Government would never receive the benefit of the discounts: "Patients may opt to not have their insurance billed if $4 is less than their copay."

139.    Ms. Spier also understood that GHP beneficiaries would always pay the discount price or less, but the Government would never receive the benefit of the discounts:

36

[T]he pharmacy will need to process first on the patients regular insurance to see what their copay is and if it is more than the $4 generics - the pharmacy will need to reverse the claim and then move it over to the membership.

140.    Defendant also systematically violated Medicare Part D regulations by not adjudicating the claims through the Part D beneficiaries' insurance plans using the discounted prices for Part D beneficiaries in their "donut hole".[5] As noted, access to Negotiated Prices must be provided to Medicare Part D beneficiaries even when no benefits are otherwise payable on behalf of a beneficiary due to the application of a deductible or other cost-sharing. Further, as explained by CMS in its 2006 memorandum containing the Wal-Mart example, Part D beneficiaries are entitled to have the offered discount price processed through their Part D plan to receive credit towards their TrOOP (true out of pocket cost deductible). Mr. Talamantez however, explained that with respect to Defendant's Part D customers:

> Q. For those Medicare Part D customers, how will the membership program affect their "donut-hole" threshold?
>
> R. Medicare Part D customers who are in the "donut hole" will have a choice: (1) customers can have their generic program which is on the $4 program submitted to Medicare Part D insurance plan. Customers will pay co-pay adjudicated by insurance plan or (2) customers can enroll in the membership program for those generics on the $4 plan, pay cash for the product. However, for option #2, prescription sales will not be submitted to their Medicare Part D plan thus not being applied to towards their donut-hole threshold."

---

[5] The Medicare Part D "donut hole" is a coverage gap that takes effect once the beneficiary and the PDP have spent a certain amount on covered drugs. Part D coverage resumes once the beneficiary spends enough money on covered drugs to cross the "donut hole." As Relator's Part D examples show, Defendant's submissions of inflated U&C prices to GHPs sometimes resulted in Defendant's GHP customers paying more than $4 co-payments for drugs offered to cash customers for $4, and resulted in GHPs reimbursing additional sums on top of the customers' inflated co-pay. Besides resulting in Part D and its beneficiaries collectively paying Defendant inflated amounts for the drugs, Defendant's fraudulent submissions of inflated U&C prices caused or contributed to some Part D beneficiaries prematurely reaching the Part D "donut hole" plan period where the beneficiaries' out-of-pocket expenses increase.

141.   Part D customers should not have been offered a false choice, but were instead entitled to have the claims processed through their Part D plans at the discount prices and receive health and safety Drug Utilization Review and credit toward their deductible thereby allowing them to move out of the "donut hole" and into the catastrophic coverage provisions of Part D.

## C.   Information Supporting Relator's Claims

### 1.   Relator's General Supporting Information

142.   In or about June of 2011, Relator became employed at Safeway's Tom Thumb #3625 in Grapevine, Texas. He was trained by Defendant on its major pharmacy policies, processes, and procedures, including its pricing, billing practices, promotions, dispensing, safety standards, drug utilization review and regulatory compliance.

143.   Relator's training included training with Defendant's computer claims adjudication PDX system. Relator was informed that a newer Enterprise system interface was being rolled out over time, however all drug descriptions and pricing files including the drug product master list database, called the "charge master file," were centrally managed and controlled by Safeway's corporate IT department.

144.   As part of his training, Relator was provided Defendant's "Code of Business Conduct" which claimed:

> Through the years, Safeway has earned a well-deserved reputation for honesty, integrity and fair dealing. It's up to each of us to protect and enhance that reputation.

> The guidelines set out in this Code are to be followed at all levels of the company. It applies to all of our members of the Board of Directors, officers, employees and, where required by law, certain contractors and agents. We refer to all persons covered by this Code as 'company employees' or simply 'employees.' Throughout this document, the terms 'Safeway' and the 'company' refer to Safeway Inc., its majority-owned or controlled subsidiaries and its operations in any country.

> Truthful and Honest Dealings With Our Customers: Safeway's success depends on maintaining our hard-earned reputation for honesty and integrity. We must

38

price and label accurately, be truthful in our advertising and give full measure and weight in the merchandise we sell. Dishonest conduct cannot be tolerated.

The company expects employees to adhere to the laws, regulations, and internal policies and procedures governing pharmacy operations and billings. Employees must not present or cause to be presented any false or fraudulent pharmacy claims for payment.

If you observe any unethical or unlawful conduct you are required to report it to your supervisor.

145.    While working at Defendant's Tom Thumb pharmacy, Relator discovered that "membership club" customers (that were actually cash customers) paid discount prices according to terms publicly published on Defendant's formulary discount list, while insurance customers, including GHPs and their beneficiaries, were charged much higher prices for the same drugs. This differing treatment was contrary to the custom and practices of the pharmacy industry in which Relator had worked for decades.

146.    Relator asked his pharmacy staff technicians to explain the discrepancies between the prices charged to different customers and why GHPs and insurance customers did not get the benefit of the discount prices offered on Defendant's discount price list. The staff technicians had no clear explanation. The most common response he received were statements to the effect that you "just had to know the customers and how they had been historically billed" for particular prescriptions.

147.    Relator reviewed historical patient files on the Defendant's claims adjudication computer system to try to understand and properly apply the Defendant's billing polices. The patient billing records that Relator reviewed confirmed that Defendant was routinely billing GHPs a U&C price of $11.99 for drugs otherwise available for $4.

148.    Unlike its competitor Wal-Mart, Defendant did not report its discounted prices to GHPs as its U&C price, and thereby failed to give GHPs the benefit of Defendant's nationally

promoted discounted prices available to the general public. Instead, Relator discovered that Defendant was submitting U&C or Negotiated Prices to GHPs that were three times greater than the actual discounted U&C prices.

149.    Through his general pharmacy experience, his training, his review of the documentation provided to him by Defendant, in conversations with Defendant's employees and by working with the Defendant's computer claims adjudication system and reviewing historical records of paid patient claims, Relator discovered that Safeway's computer claims adjudication system was set up by Defendant so that all claims processed for GHPs were being adjudicated at inflated U&C and Negotiated Prices. Relator also discovered that Defendant was only offering its publicly promoted discounted prices to customers without insurance, and that those claims were being processed as cash transactions at the nationally promoted discounted prices.

150.    Particularly confusing to Relator was Defendant's policy that if a GHP beneficiary's co-payment was higher than $4, Defendant would sell the GHP beneficiary the drug for the $4 price, but *only* if that GHP customer requested the lower price. If the drug was actually sold at $4, Defendant processed the claim as a cash transaction and only collected $4 from the GHP customer. Defendant did not bill the GHP for the drug.

151.    Safeway's practice of keeping these prescriptions out of its computer system endangers patients' health and safety, because the otherwise standard Drug Utilization Review is not conducted on behalf of patients as would be the case if the claim had been adjudicated through the patients' GHP insurance.

152.    On the other hand, if the Defendant could get away with overcharging the GHP beneficiary with a high copay, *i.e.*, if the GHP customer did not request the lower price, Safeway's policy was to do so. Relator believed this policy was grossly unfair and unethical and

did not comport with Defendant's Code of Business Conduct ethical standards.

153.    As an example, if the GHP beneficiary's co-payment was higher than $4, but that GHP customer failed to ask for the lower $4 price, Defendant's policy was to bill the customer through their GHP insurance at $11.99 for the drug, even though the drug is available for $4 just for asking. In this situation, the customer and the GHP both may pay an inflated claim.

154.    Pharmacy staff had to keep notes on the computer system of what prices particular patients were charged in order to keep track of which patients were receiving discounts and which patients were not being offered discounts in order to charge consistent prices when refilling a particular patient's prescriptions. That is what the pharmacy technicians were referring to when they told Relator you "just had to know the customers and how they had been historically billed" for particular prescriptions.

155.    Relator discovered that if the GHP beneficiary's co-payment was lower than $4, then the claim was adjudicated through their GHP insurance, the customer paid the less than $4 co-payment, but the GHP was billed an inflated charge (such as $11.99) for the drug, not $4. In this situation, the GHP paid a falsely inflated claim.

156.    Relator further discovered that if the GHP customer asked for a price match, for example, for a drug on the Wal-Mart list but not on the Defendant's list, Defendant's policy was to honor the $4 Wal-Mart price, but nevertheless submit the $11.99 U&C price to the GHP rather than the $4 price.[6] As a result, the GHP paid the falsely inflated claim.

157.    Relator further discovered that Defendant's discount program also offered club

---

[6] Defendant however, instructed its pharmacists not to match the competitor's lower price if the sale would be below its actual cost.

members 10% discounts on all brand drugs and 20% discounts on generic drugs that were not on the $4 formulary, but, as a matter of policy, Defendant did not offer these publicly promoted discounts to GHPs or to customers with other insurance.

158.    As is set forth below, Relator was ultimately told by his supervisors that Defendant's convoluted billing polices were intentionally designed to enable Defendant to charge inflated prices and receive inflated reimbursements from GHPs and other insurance.

159.    Relator obtained copies of club enrollment forms and promotional documents, including the $4 drug formulary list with terms and conditions of the discount offers created by Defendant and uniformly applied across multiple Safeway banners and in multiple states. These lists were freely given out by pharmacists to customers who requested them. The Wal-Mart drug formulary list was also generally kept on hand by pharmacists to confirm price matches as necessary.

160.    Defendant's membership enrollment form was standard across all affiliates and listed all of Defendant's banners across the top of the form. It included the terms and conditions of the discount membership program as described herein and included the following disclaimers:

Program is for patients who have no prescription or insufficient drug coverage

Discounts and Incentives are not available to patients whose prescriptions are paid in whole or part by Medicare, Medicaid or other federal health care programs . . . .

THIS IS NOT INSURANCE.

161.    As part of his training, Relator was given a copy of the "Corporate Pharmacy Communication" explaining why Defendant was ending its automatic $4 program and moving to the membership program:

Corporate Pharmacy Communication For Internal Use Only

Q. Why are we now going to require membership for the $4 Generic Program?

R. The reason for the membership is due to the expanded offerings of the current program along with the flexibility to add more incentives as the program grows. We are not taking anything away from the old $4 program.

The enhancements will be:
- 10% off branded medications
- 20% off non-formulary generic medications
- $4 pricing on over 300 generic formulary medications
- Automatic enrollment into the auto-refill program

Q. Who will be the main targets for the new membership program?

R. The new membership program will be specifically targeted to the following groups:
- Those individuals with no insurance
- Those individuals with insufficient insurance coverage

Q. When is the new program going to begin?

R. The membership program will begin on July 18th, 2010

Q. What are the requirements for membership? Is there going to be a fee?

R. At this time, there is no fee to enroll into the membership. Membership requirements are to complete the Membership enrollment form.

Q. What Information is required to complete the membership form?

R. Information required is:

- Club Card Number or Phone# (please make sure that phone # used is the one tied into the Club Card
- Customer Name
- Customer Address
- Dependent's
- DOB
- Email address

Q. How is the individual participating in the membership program to be setup in Pharmacy system?

R. Customers enrolled in the Membership Program will be set up using the following Plan name:

| Division | Pharmacy | Plan | Submit Group |
|---|---|---|---|
| 5 | Safeway | Safeway Club Card Rx | SCCRX |
| 10 | Dominick's | Fresh Values Club Card Rx | DCCRX |
| 17 | Safeway | Safeway Club Card Rx | SCCRX |
| 19 | Safeway | Safeway Club Card Rx | SCCRX |
| 20 | Tom Thumb | Reward Club Card Rx | TCCRX |
| 20 | Randalls | Remarkable Club Card Rx | RCCRX |
| 25 | Safeway | Safeway Club Card Rx | SCCRX |

| 27 | Safeway | Safeway Club Card Rx | SCCRX |
| 29 | Vons | Vons Club Card Rx | VCCRX |
| 35 | Safeway | Safeway Club Card Rx | SCCRX |
| 35 | Genuardi's | Genuardi's Club Card Rx | GCCRX |

If customer is on Health Club55 (with submit group HC55), PPE edit will update to proper submit group.

Pricing will be returned as follows:
Dominick's, Randalls, Eastern, Las Vegas, 5 Denver stores
- $4.00/$8.00/$12.00 for 30/60/90 for Generic list (Eastern has additional generics)
- 10% off on Brands
- 20% off on Generics

If you are price matching on the membership program

For PDX:
1. Use Appropriate plan and Submit Group
2. Input the PA of 610550
3. Check the prescription
4. Input the price override and press [Enter]
5. Select (P) Price Override or (C) Copay Override: P
6. Still Bill to T/P (YIN): Y
7. WARNING - NO T/P Edit Checking or Co-pay Calculations (Acknowledge)
8. F2 to Fill & T to Transmit

For ENTERPRISE
1. Use Appropriate plan and Submit Group
2. Enter into the Additional Information screen
3. Input appropriate price match on User Defined 1 line
4. Press "OK"

Q. Can customers "opt out" of the auto refill option?
R. Yes. Customers enrolling into the membership program will automatically be enrolled into the auto refill program where applicable. There is a box in the membership form for customers to MARK if they want to opt out.

Q. If customer has prescription drug coverage, but their co-pay is higher than the $4 for those specific generics, can the customer choose to pay cash instead of their copay?
R. Yes. Customers have the option to forego their current prescription drug coverage and pay cash. But customer must enroll in the membership program.

Q. For those Medicare Part D customers, how will the membership program affect their "donut-hole" threshold?

R. Medicare Part D customers who are in the "donut hole" will have a choice: (1) customers can have their generic program which is on the $4 program submitted to Medicare Part D insurance plan. Customers will pay co-pay adjudicated by insurance plan or (2) customers can enroll in the membership program for those generics on the $4 plan, pay cash for the product. However, for option #2, prescription sales will not be submitted to their Medicare Part D plan thus not being applied to towards their donut-hole threshold."

Q. What do we do with the completed enrollment forms?
R. Completed enrollment forms should be sent to your division office every Saturday.

162.    The FAQ, Generic Drug formularies, and Discount Club Membership Applications demonstrate the membership program operated nationwide across Defendant's banners and divisions. No information or only basic identifying information was required to join. There was no fee to join.

163.    The FAQ demonstrates the discount program was not offered to GHPs although their beneficiaries could participate and receive discounts outside of the beneficiary's GHP insurance plan if the beneficiary chose to enroll in the membership program.

164.    The FAQ demonstrates Defendant's membership club program, including its computer claims adjudication systems, was deliberately programmed and structured to ensure that club members received the discount prices (the actual U&C or Negotiated Prices), but GHPs and other insurance were billed false, inflated prices. Defendant did not offer customers with GHP insurance the $4 price or the program's other offered discounts (price matching or 10% off brand and 20% off non-formulary generics) unless their co-payment exceeded the discount price and the customers "chose" the lower price.

165.    The FAQ demonstrates that for price matching the pharmacist still bills "T/P" (third party insurance), meaning price matching discounts were given to the customers but GHP insurance was still billed the higher U&C price.

166.    The FAQ identifies PDX and Enterprise, which are Defendant's integrated pharmacy computer systems. Both were centrally managed by Defendant's IT and Corporate Pharmacy Administration.

167.    The FAQ confirms that Defendant's program was designed not to offer Medicare Part D customers Negotiated Prices through their Part D plans while beneficiaries were in the "donut hole" and instead offered them a false choice of overpaying for the drugs or paying cash to receive the discount price, while forgoing the Part D mandated Drug Utilization Review and credit towards their Part D deductible.

168.    Through his general pharmacy experience, training and documents provided by Defendant in the course of his duties; in conversations with his supervisors and other of Defendant's employees; and, by working with the Defendant's computer claims adjudication system and reviewing historical records of paid patient claims, Relator discovered and determined that Defendant's fraudulent billing policies and practices relating to the submission of false and inflated U&C prices and falsely inflated GHP claims applied to all GHPs, regardless of the GHP program, including Medicare Part D, Medicaid, TRICARE and the FEHBP program. Defendant's policies and practices did not treat particular GHPs differently. Defendant's policies, practices and computer systems were designed by Defendant to overcharge all GHPs. Defendant engaged in a pattern and practice of reporting fraudulent, inflated U&C prices to all GHPs for drugs it sold every day to cash customers for materially lower prices.

169.    Relator believed Defendant's conduct was unfair and cheated GHPs and Defendant's customers by charging GHP beneficiaries higher prices than the discount prices promoted nationally and routinely offered to cash customers (unless the GHP beneficiary asked for the lower $4 price, at which time, the lower price would be honored).

170.     During Relator's review of patient billing files a pharmacy technician witnessed Relator's activities, including his copying of screenshots and supporting documentation and reported him to Defendant's management. Relator was then called into a meeting and interrogated by Defendant's management.

171.     On or about October 3, 2011, in a meeting with Rodney Lee, District Human Resources Manager for Tom Thumb and Randalls, and David Hicks, Regional Director of Pharmacy for Tom Thumb and Randalls, Relator was confronted with the accusation that he was attempting to steal proprietary information.

172.     Relator explained that he was reviewing patient files and billing information and making copies of screenshots because he was trying to understand why customers with government insurance were being charged $11.99 for drugs that cash customers routinely received for $4. Relator said that he had discussed this issue with some pharmacy technicians that handled the billing, but they could not explain it.

173.     Mr. Hicks explained to Relator that Defendant was "not a benevolent organization" and that the $4 price would only be given to GHP customers who asked for it; otherwise, they would be charged the higher prices. More importantly, Mr. Hicks told Relator that requiring the GHP customers to ask for the lower $4 price allowed Defendant to "arbitrarily inflate" the U&C prices it submitted to GHPs. Mr. Hicks further stated to Relator that "Safeway couldn't make any money if it submitted the discount price as its U&C to third party payers."

174.     Relator rejected Mr. Hicks' justification for Defendant's pricing fraud, stating that it was "hard for him to get his head around" such a billing system. Relator said he had long worked at hospitals that charged a single price for a particular drug at a particular dose. Relator told Mr. Hicks he thought it was confusing that Defendant charged multiple U&C prices to

different customers, and that the cash price was lower than the price charged to GHP customers unless they asked for the lower price.

175.    Relator came to understand that Defendant's billing practices were plain and simple fraud. He sought to obtain sufficient proof to bring this action and expose it.

176.    After Relator raised the issue of Safeway's fraud with his supervisors, he realized he was being closely watched by staff technicians who repeatedly questioned his activities. This made it difficult for him to gather large numbers of representative examples.

177.    Relator however was able to obtain some specific representative examples of Defendant's fraudulent GHP transactions from Defendant's computer claims adjudication system before he resigned in or about the end of October 2011.

178.    Although Relator did not obtain a copy of a specific transaction involving an FEHBP patient, Relator personally filled prescriptions on numerous occasions for multiple FEHBP patients on which Defendant submitted false inflated U&C prices on the FEHBP claims in accordance with Defendant's stated policies and practices to defraud GHPs and private insurance.

179.    FEHBP claims, like Medicare Part D and TRICARE claims, are adjudicated in the same manner nationwide. Relator's observations regarding FEHBP, Medicare Part D and TRICARE, therefore apply with equal force in every state in which Defendant operates.

180.    Relator also spoke with a former Safeway banner pharmacist who worked as a licensed pharmacist in two Colorado Safeway pharmacies for five years during the relevant time period and who filled thousands of prescriptions for Defendant's customers.

181.    Relator confirmed that his allegations of a U&C pricing fraud scheme as alleged in his complaint (where cash payers were charged discount prices for drugs and GHPs were

48

charged inflated prices for the same drugs) were consistent with the Colorado pharmacist's knowledge and personal experience working as a pharmacist at Safeway's pharmacies in Colorado.

182.    Relator obtained additional records of specific Safeway pharmacy transactions involving Safeway customers with GHP insurance from the former Colorado Safeway pharmacist referred to above that further corroborate Relator's allegations of Safeway's U&C pricing fraud scheme against GHPs. These records provide further evidence that Safeway engaged in the fraudulent conduct Relator first identified in Texas. These records also offer further evidence that Safeway's fraud scheme was centrally controlled by Defendant, that it was uniform and nationwide in scope, and that it was imposed by Defendant upon its stores, including upon Safeway-affiliated banners throughout the United States.

183.    These additional Safeway pharmacy transactions show that the nationwide fraud scheme Relator alleges in this Amended Complaint has been verified.

184.    These additional records were voluntarily provided to the Colorado pharmacist by patients, and were never shared with the Government or publicly disclosed.

185.    Relator also learned that the Colorado Safeway pharmacist personally filled prescriptions on many occasions for numerous FEHBP patients, and routinely submitted FEHBP claims with Defendant's inflated U&C prices. The FEHBP claims were processed and paid based on the inflated prices, including one FEHBP beneficiary with initials W.C.

### 2.  Specific Medicare Part D Transactions

186.    The following representative examples relate to pharmacy transactions that took place at Tom Thumb Pharmacy #3625 in Grapevine, Texas and Safeway Pharmacy #1792 in Colorado Springs, Colorado. They illustrate that Defendant engaged in the U&C fraud scheme alleged by Relator above with respect to Medicare Part D. As referenced in Paragraph 179,

Medicare Part D claim adjudication standards and procedures are uniform nationwide. Medicare

Part D claims are required to be processed in the same manner, regardless of the state or

jurisdiction in which the transaction occurs. The information below specifies particular

transactions by drug name, quantity dispensed, date and amounts paid by patient ("Co-Pay") and

GHP ("GHP Reimbursement"). Patients are referred to by alias initials to address privacy

concerns under HIPAA; an index identifying patients' true identities is available for *in camera*

review. "Reported U&C" is the inflated Negotiated Price that Defendant reported to GHPs.

"Actual U&C" refers to the true cash price offered to the general public. "GHP Allowable" is

what the GHP should have paid, after applying the patient Co-Pay to the Actual U&C.

"Overpayment" refers to the amount overpaid by the GHP due to U&C manipulation. A brief

narrative statement of the transaction is found beneath the Overpayment amount.

| a) **Drug**: Haloperidol 5 mg tab, 30 count | **Date**: Oct. 22, 2011 | **Patient**: GG **Store**: #3625 |
|---|---|---|
| Reported U&C: $ 11.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 8.31 |
| Actual U&C: $ 4.00 | Total Paid: $ 8.31 | GHP Allowable: $ 4.00 |
| | | **Overpayment: $ 4.31** |
| Defendant reported U&C as $11.99 instead of $4.00. Medicare Part D paid $8.31. The GHP overpaid by $4.31 due to U&C manipulation. | | |
| b) **Drug**: Lisinopril 20 mg tab, 30 count | **Date**: Sept. 28, 2011 | **Patient**: HH **Store**: #3625 |
| Reported U&C: $11.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 6.42 |
| Actual U&C: $ 4.00 | Total Paid: $ 6.42 | GHP Allowable: $ 4.00 |
| | | **Overpayment: $ 2.42** |
| Defendant reported U&C as $11.99 instead of $4.00. Medicare Part D paid $6.42. The GHP overpaid by $2.42 due to U&C manipulation. | | |
| c) **Drug**: Lisinopril 20mg tab, 30 count | **Date**: Oct. 25, 2011 | **Patient**: HH **Store**: #3625 |
| Reported U&C: $11.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 6.42 |
| Actual U&C: $ 4.00 | Total Paid: $ 6.42 | GHP Allowable: $ 4.00 |
| | | **Overpayment: $ 2.42** |
| Defendant reported U&C as $11.99 instead of $4.00. Medicare Part D paid $6.42. The GHP again overpaid by $2.42 due to U&C manipulation. | | |
| d) **Drug**: Lisinopril 20 mg tab, 30 count | **Date**: Sept. 24, 2011 | **Patient**: II **Store**: #3625 |

| Reported U&C: $11.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 8.75 |
|---|---|---|
| Actual U&C: $ 4.00 | Total Paid: $ 8.75 | GHP Allowable: $ 4.00 |
| | | **Overpayment: $ 4.75** |

Defendant reported U&C as $11.99 instead of $4.00. Medicare Part D paid $8.75. The GHP overpaid by $4.75 due to U&C manipulation.

| **e) Drug**: Allopurinol 300 mg tab, 60 count | **Date**: Oct. 14, 2011 | **Patient**: JJ **Store**: #3625 |
|---|---|---|
| Reported U&C: $ 12.69 | Co-Pay: $ 8.00 | GHP Reimbursement: $ 0.00 |
| Actual U&C: $ 8.00 | Total Paid: $ 8.00 | GHP Allowable: $ 0.00 |
| | | **Overpayment: $ 0.00** |

Defendant reported U&C as $12.69 instead of $8.00. The patient paid $8.00, and Medicare Part D paid nothing. This prescription, for a patient's dog, was correctly processed at the cash price rather than the inflated reported U&C. Another prescription for a dog was filled for Benazepril 5mg, 30 count, at $4.00 on 10/18/11. Consequently, Defendant gave patients' dogs the benefit of its discounted prices while charging inflated prices to needy customers with coverage through Medicaid, Medicare and other GHPs.

| **f) Drug**: Lisinopril 10 mg tab, 30 count | **Date**: Sept. 29, 2011 | **Patient**: KK **Store**: #3625 |
|---|---|---|
| Reported U&C: $11.99 | Co-Pay: $ 5.02 | GHP Reimbursement: $ 0.38 |
| Actual U&C: $ 4.00 | Total Paid: $ 5.40 | GHP Allowable: $ 0.00 |
| | | **Overpayment: $ 0.38** |

Defendant reported U&C as $11.99 instead of $4.00. Medicare Part D paid $0.38, and the patient paid $5.02. The patient overpaid by $1.02, and the GHP overpaid by $0.38, due to U&C manipulation.

| **g) Drug**: Naproxen 500 mg tab, 30 count | **Date**: Oct. 22, 2011 | **Patient**: LL **Store**: #3625 |
|---|---|---|
| Reported U&C: $ 11.99 | Co-Pay: $ 5.73 | GHP Reimbursement: $ 0.00 |
| Actual U&C: $ 4.00 | Total Paid: $ 5.73 | GHP Allowable: $ 0.00 |
| | | **Overpayment: $ 0.00** |

Defendant reported U&C as $11.99 instead of $4.00. The patient paid $5.73, and Medicare Part D paid nothing. The patient overpaid by $1.73 due to U&C manipulation. While no GHP damages result, this example shows that patients were sometimes defrauded in addition to GHPs.

| **h) Drug**: Metformin 500mg tab, 60 count | **Date**: March 20, 2012 | **Patient**: AA **Store**: #1792 |
|---|---|---|
| Reported U&C: $12.39 | Co-Pay: $ 2.60 | GHP Reimbursement: $ 2.40 |
| Actual U&C: $ 4.00 | Total Paid: $ 5.00 | GHP Allowable: $ 1.40 |
| | | **Overpayment: $ 1.00** |

Defendant reported U&C as $12.39 instead of $4.00. After applying a $2.60 patient copay, Medicare Part D should have paid the remaining $1.40 instead of $2.40. The GHP overpaid by $1.00 due to U&C manipulation.

| **i) Drug**: Metformin 500mg tab, 60 count | **Date**: June 8, 2013 | **Patient**: AA **Store**: #1792 |
|---|---|---|
| Reported U&C: $ 12.39 | Co-Pay: $ 2.65 | GHP Reimbursement: $ 2.89 |
| Actual U&C: $ 4.00 | Total Paid: $ 5.54 | GHP Allowable: $ 1.35 |

| | | Overpayment: **$ 1.54** |
|---|---|---|
| Defendant reported U&C as $12.39 instead of $4. After applying a $2.65 patient copay, Medicare Part D should have paid the remaining $1.35 instead of $2.89. The GHP overpaid by $1.35 due to U&C manipulation. | | |
| **j) Drug**: Lisinopril 20mg tab, 30 count | **Date**: Sept. 25, 2013 | **Patient**: AA **Store**: #1792 |
| Reported U&C: $12.39 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 5.00 |
| Actual U&C: $ 4.00 | Total Paid: $ 5.00 | GHP Allowable: $ 4.00 |
| | | Overpayment: **$ 1.00** |
| Defendant reported U&C as $12.39 instead of $4. Medicare Part D paid $5. The GHP overpaid by $1 due to U&C manipulation. | | |
| **k) Drug**: L-Thyroxine 75mcg tab, 90 count | **Date**: Nov. 8, 2013 | **Patient**: AA **Store**: #1792 |
| Reported U&C: $37.17 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 24.33 |
| Actual U&C: $ 10.00 | Total Paid: $ 24.33 | GHP Allowable: $ 10.00 |
| | | Overpayment: **$ 14.33** |
| Defendant reported U&C as $37.17 instead of $10 for 90-count L-Thyroxine 75mcg tabs. Medicare Part D paid $24.33. The GHP overpaid by $14.33 due to U&C manipulation. | | |
| **l) Drug**: L-Thyroxine 75mcg tab, 90 count | **Date**: Feb. 5, 2014 | **Patient**: AA **Store**: #1792 |
| Reported U&C: $37.17 | Co-Pay: $ 2.55 | GHP Reimbursement: $ 20.07 |
| Actual U&C: $ 10.00 | Total Paid: $ 22.62 | GHP Allowable: $ 7.45 |
| | | Overpayment: **$ 12.62** |
| Defendant reported U&C as $37.17 instead of $10 for 90-count L-Thyroxine 75mcg tabs. After applying a $2.55 patient copay, Medicare Part D should have paid $7.45 instead of $20.07. The GHP overpaid by $12.62 due to U&C manipulation. | | |
| **m) Drug**: L-Thyroxine 75mcg tab, 90 count | **Date**: May 3, 2014 | **Patient**: AA **Store**: #1792 |
| Reported U&C: $37.17 | Co-Pay: $ 2.55 | GHP Reimbursement: $ 20.07 |
| Actual U&C: $ 10.00 | Total Paid: $ 22.62 | GHP Allowable: $ 7.45 |
| | | Overpayment: **$ 12.62** |
| As occurred in February 2014, Defendant again reported U&C as $37.17 instead of $10 for 90-count L-Thyroxine 75mcg tabs. After applying a $2.55 patient copay, Medicare Part D should have paid $7.45 instead of $20.07. The GHP overpaid by $12.62 due to U&C manipulation. | | |

### 3.  Specific TRICARE Transactions

187.    The following representative examples relate to pharmacy transactions that took place at Tom Thumb Pharmacy #3625 in Grapevine, Texas; Safeway Pharmacy #1792 in Colorado Springs, Colorado; and Safeway Pharmacy #1795 in Fountain, Colorado. They illustrate that Defendant engaged in the U&C fraud scheme alleged by Relator above with

respect to TRICARE. As referenced in Paragraph 179, TRICARE claim adjudication standards

and procedures are uniform nationwide. TRICARE claims are required to be processed in the

same manner, regardless of the state or jurisdiction in which the transaction occurs. The

information below specifies particular transactions by drug name, quantity dispensed, date and

amounts paid by patient ("Co-Pay") and GHP ("GHP Reimbursement"). Patients are referred to

by alias initials to address privacy concerns under HIPAA; an index identifying patients' true

identities is available for *in camera* review. "Reported U&C" is the inflated U&C that Defendant

reported to GHPs. "Actual U&C" refers to the true cash price offered to the general public.

"GHP Allowable" is what the GHP should have paid, after applying the patient Co-Pay to the

Actual U&C. "Overpayment refers" to the amount overpaid by the GHP due to U&C

manipulation. A brief narrative statement of the transaction is found beneath the Overpayment

amount.[7]

| **a) Drug**: Allopurinol 300mg tab, 30 count | **Date**: Sept. 12, 2011 | **Patient**: MM **Store**: #3625 |
|---|---|---|
| Reported U&C: $ 11.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 4.69 |
| Actual U&C: $ 4.00 | Total Paid: $ 4.69 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 0.69** |
| Defendant reported U&C as $11.99 instead of $4.00. TRICARE paid $4.69. The GHP overpaid by $0.69 due to U&C manipulation. | | |
| **b) Drug**: Allopurinol 300mg tab, 30 count | **Date**: Oct. 10, 2011 | **Patient**: MM **Store**: #3625 |
| Reported U&C: $ 11.99 | Co-Pay: $ 4.35 | GHP Reimbursement: $ 0.34 |
| Actual U&C: $ 4.00 | Total Paid: $ 4.69 | GHP Allowable: $ 0.00 |
| | | **Overpayment: $ 0.34** |
| Defendant reported U&C as $11.99 instead of $4.00. After applying a $4.35 patient copay, | | |

---

[7] Note that the standard TRICARE patient copay amount is $5.00. Since the Actual U&C was $4.00 in each TRICARE example, the patient overpaid by $1.00 per transaction in which a copay was collected. Both the patient and the GHP were defrauded by Defendant's U&C manipulation. This is likely to hold true for all TRICARE claims that should have been processed as $4 U&C transactions.

| TRICARE paid $ 0.34. The patient overpaid by $0.35 and the GHP overpaid by $0.34 due to U&C manipulation. | | |
|---|---|---|
| **c) Drug**: Silver Sulfa 1% cream, 50 gram | **Date**: June 6, 2014 | **Patient**: EE <br> **Store**: #1792 |
| Reported U&C: $ 10.29 | Co-Pay: $ 5.00 | GHP Reimbursement: $ 5.29 |
| Actual U&C: $ 4.00 | Total Paid: $ 10.29 | GHP Allowable: $ 0.00 |
| | | **Overpayment: $ 5.29** |
| Defendant reported U&C as $10.29 instead of $4.00. The patient should have been charged $4.00 instead of a $5.00 copay, and TRICARE should have paid nothing. The GHP overpaid by $5.29 due to U&C manipulation. | | |
| **d) Drug**: Neomycin/Polymyxin/ Dexa 0.1% ointment, 4gm | **Date**: Nov. 18, 2013 | **Patient**: EE <br> **Store**: #1792 |
| Reported U&C: $ 17.15 | Co-Pay: $ 5.00 | GHP Reimbursement: $ 12.15 |
| Actual U&C: $ 4.00 | Total Paid: $ 17.15 | GHP Allowable: $ 0.00 |
| | | **Overpayment: $ 12.15** |
| Defendant reported U&C as $17.15 instead of $4.00. The patient should have been charged $4.00 instead of a $5.00 copay, and TRICARE should have paid nothing. The GHP overpaid by $12.15 due to U&C manipulation. | | |
| **e) Drug**: Doxycycline 100mg tab, 14 ct | **Date**: Dec. 6, 2013 | **Patient**: FF <br> **Store**: #1795 |
| Reported U&C: $ 62.45 | Co-Pay: $ 5.00 | GHP Reimbursement: $ 57.45 |
| Actual U&C: $ 4.00 | Total Paid: $ 62.45 | GHP Allowable: $ 0.00 |
| | | **Overpayment: $ 57.45** |
| Defendant reported U&C as $ 62.45 instead of $4.00. The patient should have been charged $4.00 instead of a $5.00 copay, and TRICARE should have paid nothing. The GHP overpaid by $57.45 due to U&C manipulation. | | |

### 4.  Specific Medicaid Transactions

188.    The following representative examples relate to pharmacy transactions that took place at Tom Thumb Pharmacy #3625 in Grapevine, Texas[8] and Safeway Pharmacy #1792 in Colorado Springs, Colorado. They illustrate that Defendant engaged in the U&C fraud scheme

---

[8] In this action, Plaintiffs do not seek to enforce and recover on claims for unlawful actions committed by Defendant against the Texas Medicaid program. However, information concerning Defendant's submission of fraudulent, inflated U&C prices to Texas Medicaid (in order to receive higher reimbursement for drugs it otherwise sold to cash customers at materially lower prices) is included in this complaint to show that Defendant's fraudulent conduct was pervasive across all GHPs and that it knowingly submitted false claims to Texas Medicaid as part of a larger, carefully designed and orchestrated, corporate-wide business plan to defraud GHPs generally, and that it did not engage in this practice by accident or through inadvertence.

alleged by Relator above with respect to Medicaid. The information below specifies particular transactions by drug name, quantity dispensed, date and amounts paid by patient ("Co-Pay") and GHP ("GHP Reimbursement"). Patients are referred to by alias initials to address privacy concerns under HIPAA; an index identifying patients' true identities is available for *in camera* review. "Reported U&C" is the inflated U&C that Defendant reported to GHPs. "Actual U&C" refers to the true cash price offered to the general public. "GHP Allowable" is what the GHP should have paid, after applying the patient Co-Pay to the Actual U&C. "Overpayment" refers to the amount overpaid by the GHP due to U&C manipulation. A brief narrative statement of the transaction is found beneath the Overpayment amount.

| | | |
|---|---|---|
| **a) Drug**: Furosemide 40mg tab, 30 count | **Date**: Sept. 4, 2011 | **Patient**: NN<br>**Store**: #3625 |
| Reported U&C: $11.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 7.09 |
| Actual U&C: $ 4.00 | Total Paid: $ 7.09 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 3.09** |
| Defendant reported U&C as $11.99 instead of $4.00. Medicaid paid $7.09. The GHP overpaid by $3.09 due to U&C manipulation. | | |
| **b) Drug**: Lithium Carbonate 300mg, 30 count | **Date**: Feb. 10, 2011 | **Patient**: OO<br>**Store**: #3625 |
| Reported U&C: $11.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 8.48 |
| Actual U&C: $ 4.00 | Total Paid: $ 8.48 | GHP Allowable: $ 4.00 |
| | | **Overpayment: $ 4.48** |
| Defendant reported U&C as $11.99 instead of $4.00. Medicaid paid $8.48. The GHP overpaid by $4.48 due to U&C manipulation. | | |
| **c) Drug**: Lithium Carbonate 40mg, 30 count | **Date**: March 14, 2011 | **Patient**: OO<br>**Store**: #3625 |
| Reported U&C: $11.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 8.48 |
| Actual U&C: $ 4.00 | Total Paid: $ 8.48 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 4.48** |
| Defendant reported U&C as $11.99 instead of $4.00. Medicaid paid $8.48. The GHP again overpaid by $4.48 due to U&C manipulation. | | |
| **d) Drug**: Lithium Carbonate 300mg, 30 count | **Date**: Sept. 1, 2011 | **Patient**: OO<br>**Store**: #3625 |
| Reported U&C: $11.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 7.61 |
| Actual U&C: $ 4.00 | Total Paid: $ 7.61 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 3.61** |
| Defendant reported U&C as $11.99 instead of $4.00. Medicaid paid $7.61. The GHP overpaid | | |

by $3.61 due to U&C manipulation.

| **e) Drug**: Meloxicam 7.5mg tab, 30 count | **Date**: Oct. 2, 2014 | **Patient**: BB<br>**Store**: #1792 |
|---|---|---|
| Reported U&C: $12.39 | Co-Pay: $ 1.00 | GHP Reimbursement: $ 11.39 |
| Actual U&C: $ 4.00 | Total Paid: $ 12.39 | GHP Allowable: $ 3.00 |
| | | **Overpayment**: **$ 8.39** |

Defendant reported $12.39 as U&C instead of $4.00. Medicaid should have paid $3.00 after applying a $1.00 patient copay. The GHP overpaid by $8.39 due to U&C manipulation.

| **f) Drug**: Amoxicillin 400mg/5ml, 100 ml | **Date**: Jan. 9, 2014 | **Patient**: CC<br>**Store**: #1792 |
|---|---|---|
| Reported U&C: $15.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 15.99 |
| Actual U&C: $ 4.00 | Total Paid: $ 15.99 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 11.99** |

Defendant reported $15.99 as U&C instead of $4.00. Medicaid should have paid $4.00 instead of $15.99. The GHP overpaid by $11.99 due to U&C manipulation.

| **g) Drug**: Amoxicillin 250mg/5ml, 100 ml | **Date**: Feb. 20, 2015 | **Patient**: CC<br>**Store**: #1792 |
|---|---|---|
| Reported U&C: $9.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 9.99 |
| Actual U&C: $ 4.00 | Total Paid: $ 9.99 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 5.99** |

Defendant reported $9.99 as the U&C instead of $4.00. Medicaid should have paid $4.00 instead of $9.99. The GHP overpaid by $5.99 due to U&C manipulation.

| **h) Drug**: Nystatin/Triamcinol cream, 30 gm | **Date**: June 14, 2012 | **Patient**: DD<br>**Store**: #1792 |
|---|---|---|
| Reported U&C: $51.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 51.99 |
| Actual U&C: $ 4.00 | Total Paid: $ 51.99 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 47.99** |

Defendant reported $51.99 as the U&C instead of $4.00. Medicaid should have paid $4.00 instead of $51.99 in this egregious example. The GHP overpaid by $47.99 due to U&C manipulation.

| **i) Drug**: Nystatin/Triamcinol cream, 30 gm | **Date**: June 30, 2012 | **Patient**: DD<br>**Store**: #1792 |
|---|---|---|
| Reported U&C: $51.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 51.99 |
| Actual U&C: $ 4.00 | Total Paid: $ 51.99 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 47.99** |

Two weeks later, Defendant reported $51.99 as the U&C instead of $4.00. Medicaid should have paid $4.00 instead of $51.99. The GHP again overpaid by $47.99 due to U&C manipulation.

| **j) Drug**: Naproxen 500mg, 60 count | **Date**: Feb. 20, 2015 | **Patient**: DD<br>**Store**: #1792 |
|---|---|---|
| Reported U&C: $12.39 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 11.29 |
| Actual U&C: $ 4.00 | Total Paid: $ 11.29 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 7.29** |

Defendant reported $12.39 as U&C instead of $4.00. Medicaid should have paid $4.00 instead of $11.29. The GHP overpaid by $7.29 due to U&C manipulation.

| **k) Drug**: Loratadine 10mg, 30 count | **Date**: Oct. 30, 2012 | **Patient**: DD **Store**: #1792 |
|---|---|---|
| Reported U&C: $9.99 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 8.77 |
| Actual U&C: $ 4.00 | Total Paid: $ 8.77 | GHP Allowable: $ 4.00 |
| | | **Overpayment**: **$ 4.77** |
| Defendant reported $9.99 as the U&C instead of $4.00. Medicaid should have paid $4.00 instead of $8.77. The GHP overpaid by $4.77 due to U&C manipulation. | | |
| **l) Drug**: Ibuprofen 600mg, 60 count | **Date**: May 22, 2013 | **Patient**: DD **Store**: #1792 |
| Reported U&C: $12.39 | Co-Pay: $ 0.00 | GHP Reimbursement: $ 11.99 |
| Actual U&C: $ 4.00 | Total Paid: $ 11.99 | GHP Allowable: $ 4.00 |
| | | **Overpayment: $ 7.99** |
| Defendant reported $11.99 as the U&C instead of $4.00. Medicaid should have paid $4.00 instead of $11.99. The GHP overpaid by $7.99 due to U&C manipulation. | | |
| **m) Drug**: Ranitidine 150mg, 60 count | **Date**: Oct. 19, 2013 | **Patient**: DD **Store**: #1792 |
| Reported U&C: $12.39 | Co-Pay: $ 1.00 | GHP Reimbursement: $ 11.39 |
| Actual U&C: $ 4.00 | Total Paid: $ 12.39 | GHP Allowable: $ 3.00 |
| | | **Overpayment: $ 8.39** |
| Defendant reported the U&C at $12.39 instead of $4.00. Medicaid should have paid $3.00 after applying a $1.00 patient copay, instead of $11.39. The GHP overpaid by $8.39 due to U&C manipulation. | | |

### D.    Summary of Defendant's Fraudulent Scheme

189.    The specific examples of customer transactions described above demonstrate that Defendant charged inflated prices to GHPs for the same drugs it offered at deeply discounted prices everyday to the general public.

190.    Defendant knowingly and intentionally concealed its true discount U&C and Negotiated Prices from GHPs and reported false, inflated prices to GHPs in order to obtain payments that were excessive under reimbursement rules. Defendant further falsely certified to GHPs that the U&C and Negotiated Prices it submitted were true and accurate prices when in fact they were false and inflated prices. As a result of Defendant's fraudulent conduct, GHPs unwittingly paid to Defendant, and Defendant fraudulently collected from GHPs, excessive reimbursements. GHPs paid Defendant's false claims for prescription drugs furnished to GHP beneficiaries based on the false set of facts concerning Defendant's U&C and Negotiated Prices.

GHPs would not have paid such claims if they had known the true state of facts. Defendant's fraudulent scheme has caused, and continues to cause, GHPs to pay it significantly higher reimbursement amounts than it was, and is, entitled to receive under federal and state laws and regulations for prescriptions filled for GHP beneficiaries.

### COUNT I—FEDERAL FALSE CLAIMS ACT

191.    Relator incorporates by reference and re-alleges the preceding paragraphs as if fully set forth herein.

192.    Defendant has knowingly engaged, and continues to engage, in the fraudulent pattern and practice of submitting and causing to be submitted false claims for reimbursement to Federal Health Care Programs and State Medicaid Programs with inflated U&C and Negotiated Prices that deny the United States the discounted U&C and Negotiated Prices offered by Defendant to the general public.

193.    As alleged above, the Federal Government pays a share of the medical assistance expenditures under each State's Medicaid program known as the FMAP or FFP.

194.    The payment by the various States' Medicaid programs of Defendant's false and fraudulent Medicaid claims resulted in the Federal Government paying Defendant an inflated FMAP and/or FFP, which it should not have been paid.

195.    Title 31 U.S.C. § 3729 of the FCA states in pertinent part as follows:

(a) LIABILITY FOR CERTAIN ACTS

(1) IN GENERAL.—Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

196.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to federal and state government healthcare programs for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

197.    Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims that were paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

198.    Defendant defrauded the Government by getting false or fraudulent claims allowed or paid.

199.    The Government, unaware of the falsity of the records, statements or claims made by Defendant, paid it for claims that would otherwise not have been allowed.

200.     Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

201.     By reason of these payments, the Government has been damaged and continues to suffer damages in a substantial amount.

202.     The Government, unaware of the falsity of the claims made by Defendant and lacking knowledge of the above described fraudulent acts, relied on the accuracy of Defendant's reimbursement claims to GHPs to its detriment.

203.     The Government, being unaware of the inaccuracies and documentation deficiencies submitted by Defendant, paid and continues to pay it for claims that should not have been, and should not be paid, based upon Defendant's false and fraudulent reimbursement claims to GHPs.

## COUNT II—CALIFORNIA FALSE CLAIMS ACT

204.     Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

205.     This action is brought by Relator pursuant to the submission of false claims to the State of California in violation of California False Claims Act, CAL. GOV'T. CODE § 12650, *et seq*.

206.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT III—COLORADO FALSE CLAIMS ACT

207.     Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

208.     This action is brought by Relator pursuant to the submission of false claims to the State of Colorado in violation of Colorado Medicaid False Claims Act, COL. STAT.§ 25.5-4, *et*

*seq.*

209.    The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

### COUNT IV—DELAWARE FALSE CLAIMS AND REPORTING ACT

210.    Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

211.    This action is brought by Relator pursuant to the submission of false claims to the State of Delaware in violation of the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, *et seq*.

212.    The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

### COUNT V—DISTRICT OF COLUMBIA FALSE CLAIMS ACT

213.    Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

214.    This action is brought by Relator pursuant to the District of Columbia False Claims Act, D.C. CODE § 2-308.13, *et seq*.

215.    The allegations set forth herein constitute violations of the District of Columbia's false claims act for which the Relator seeks the maximum award pursuant to statute.

### COUNT VI—HAWAII FALSE CLAIMS ACT

216.    Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

217.    This action is brought by Relator pursuant to the Hawaii False Claims Act, HAW. REV. STAT. § 661-22, *et seq*.

218.    The allegations set forth herein constitute violations of this state's false claims act

for which the Relator seeks the maximum award pursuant to statute.

## COUNT VII—ILLINOIS FALSE CLAIMS ACT

219.     Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

220.     This action is brought by Relator pursuant to the submission of false claims to the State of Illinois in violation of the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/1, *et seq.*

221.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT VIII—MONTANA FALSE CLAIMS ACT

222.     Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

223.     This action is brought by Relator pursuant to the Montana False Claims Act, MONT. CODE ANN. § 17-8-401, *et seq.*

224.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT IX—NEW JERSEY FALSE CLAIMS ACT

225.     Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

226.     This action is brought by Relator pursuant to the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-1, *et seq.*

227.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## COUNT X—NEW MEXICO FRAUD AGAINST TAXPAYERS ACT

228.     Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set

forth herein.

229.     This action is brought by Relator pursuant to the New Mexico Fraud Against Taxpayers Act, N.M. STAT. § 27-14-1, *et seq.*

230.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

### COUNT XI—NEVADA FALSE CLAIMS ACT

231.     Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

232.     This action is brought by Relator pursuant to the submission of false claims to the State of Nevada in violation of the Nevada False Claims Act, NEV. REV. STAT. § 357.010, *et seq.*

233.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

### COUNT XII—VIRGINIA FRAUD AGAINST TAXPAYERS ACT

234.     Relator incorporates by reference and re-alleges Paragraphs 1-190 as if fully set forth herein.

235.     This action is brought by Relator pursuant to the submission of false claims to the State of Virginia in violation of the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.1, *et seq.*

236.     The allegations set forth herein constitute violations of this state's false claims act for which the Relator seeks the maximum award pursuant to statute.

## VIII.  PRAYER

WHEREFORE, for Counts I through XII, Relator prays for judgment against Defendant as follows:

A.  That Defendant, its subsidiaries, affiliates, and related organizations be found to have violated and be enjoined from future violations of the Federal False Claims Act, 31 U.S.C. § 3729, the California False Claims Act, CAL. GOV'T. CODE § 12651(a), the Colorado Medicaid False Claims Act, COL. STAT.§ 25.5-4, the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, the District of Columbia False Claims Act, D.C. CODE § 2-308.13, the Hawaii False Claims Act, HAW. REV. STAT. § 661-22, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, the Montana False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-3, the New Mexico Fraud Against Taxpayers Act, N.M. STAT. § 27-14-1, and the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3.

B.  That this Court enter judgment against Defendant, its subsidiaries, affiliates, and related organizations for treble the amount of damages sustained by The United States and each State because of their false or fraudulent claims, plus the maximum civil penalty for each violation of the Federal False Claims Act, 31 U.S.C. § 3729, the California False Claims Act, CAL. GOV'T. CODE § 12651(a), the Colorado Medicaid False Claims Act, COL. STAT.§ 25.5-4, the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, the District of Columbia False Claims Act, D.C. CODE § 2-308.13, the Hawaii False Claims Act, HAW. REV. STAT. § 661-22, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, the Montana False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False Claims Act, NEV. REV. STAT. § 357.040(1), the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-3, the New Mexico Fraud Against

Taxpayers Act, N.M. STAT. § 27-14-1, and the Virginia Fraud Against Taxpayers Act,

VA. CODE ANN. § 8.01-216.3.

      C.   That Relator be awarded the maximum amount allowed pursuant to the Federal

False Claims Act, 31 U.S.C. § 3729, the California False Claims Act, CAL. GOV'T. CODE

§ 12651(a), the Colorado Medicaid False Claims Act, COL. STAT.§ 25.5-4, the Delaware

False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201, the District of Columbia

False Claims Act, D.C. CODE § 2-308.13, the Hawaii False Claims Act, HAW. REV.

STAT. § 661-22, the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3, the Montana

False Claims Act, MONT. CODE. ANN. § 17-8-403, the Nevada False Claims Act, NEV. REV.

STAT. § 357.040(1), the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-3, the

New Mexico Fraud Against Taxpayers Act, N.M. STAT. § 27-14-1, and the Virginia

Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3

      D.   That Relator be awarded all reasonable expenses, plus reasonable attorneys' fees

and costs.

      E.   That Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,

Timothy Keller
Illinois Bar #6225309
ASCHEMANN KELLER LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone: (618) 998-9988
Facsimile: (618) 993-2565
E-Mail: tkeller@quitamlaw.org

*Lead Counsel for Relator Thomas Proctor*

65

Glenn Grossenbacher
Texas Bar No. 08541100
Law Office of Glenn Grossenbacher
24165 IH-10 West
Suite 217-766
San Antonio, Texas 78257-1160
Telephone: (210) 271-3888
E-Mail: gglaw@satx.rr.com

John E. Clark
Texas Bar No. 04287000
Rand J. Riklin
Texas Bar No. 16924275
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
Telephone: (210) 733-6030
Facsimile: (210) 733-0330
E-Mail: Clark@goodelaw.com
E-Mail: riklin@goodelaw.com

Gary M. Grossenbacher
Texas Bar No. 24008972
Attorney at Law
8114 Talbot Lane
Austin, Texas 78746
Telephone: (512) 699-5436
E-Mail: gmgtex@austin.rr.com

C. Jarrett Anderson
Texas Bar No. 00796124
Anderson LLC
1409 Wathen Avenue
Austin, TX 78703-2527
Telephone: (512) 619-4549
Facsimile: (512) 582-8545
E-Mail: jarrett@anderson-llc.com

Gaylon C. Hayes
Oklahoma Bar No. 14492
6805 S. Western, Suite 500
Oklahoma City, OK 73139
Telephone: (405) 616-5045
Fax: (405) 616-5062

E-Mail: gaylon@hhhlawfirm.com

Jason M. Idell
Texas Bar No. 24055714
Idell PLLC
3800 Westgate Blvd. Ste. 132-301
Austin, Texas 78745
Telephone: (512) 689-3081
E-Mail:    jason@idellpllc.com

*s/Paul B. Martins*
Paul B. Martins
Ohio Bar No. 0007623
Julie Webster Popham
Ohio Bar No. 0059371
James A. Tate
Ohio Bar No. 0085319
Helmer, Martins, Rice and
Popham Co., L.P.A
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
Telephone: (513) 421-2400
Facsimile: (513) 421-7902
E-Mail:    pmartins@fcalawfirm.com
           jpopham@fcalawfirm.com
           jtate@fcalawfirm.com

*Attorneys for Relator*

Relator Thomas Proctor demands a trial by jury.

*s/Paul B. Martins*
Paul B. Martins

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2016, pursuant to Local Rule 5.3 and Federal Rule of Civil Procedure 5(b), that the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system and served upon counsel of record.

By: <u>*s/Paul B. Martins*</u>
Paul B. Martins
Ohio Bar No. 0007623
Helmer, Martins, Rice and
Popham Co., L.P.A
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
Telephone: (513) 421-2400
Facsimile: (513) 421-7902
E-Mail:     pmartins@fcalawfirm.com

*Counsel for Relator Thomas Proctor*