IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

UNITED STATES OF AMERICA,    )
and THE STATES OF CALIFORNIA,    )
COLORADO, DELAWARE,    )
HAWAII, ILLINOIS, MONTANA,    )
NEVADA, NEW JERSEY, NEW    )
MEXICO,  VIRGINIA, and the    )
DISTRICT OF COLUMBIA, ex rel.    )
THOMAS PROCTOR,    )
    )
    Plaintiffs and Relator,    )    NO. 11-3406
    )
    v.    )
    )
SAFEWAY, INC.,    )
    )
    Defendant.    )

OPINION

RICHARD MILLS, U.S. District Judge:

This is a qui tam action.

The Relator alleges that Defendant Safeway, Inc. and all pharmacies under its operation and control knowingly perpetrated a false "usual and customary" pricing fraud scheme against government health programs as company policy to increase profits.

The Plaintiffs and Relator assert violations of the Federal False Claims

Act ("FCA"), 31 U.S.C. §§ 3729 et seq., and related acts under the applicable state laws.

Pending is Safeway's Motion to Dismiss.

## I. BACKGROUND

This is an action for damages and civil penalties on behalf of the United States of America and the Plaintiff States by the Relator against Defendant Safeway, Inc., arising from Safeway's alleged fraudulent pricing scheme perpetrated in its pharmacies nationwide against government health programs.

According to the Complaint, Relator Thomas Proctor is a resident of the State of Texas. The Relator holds a BS in Pharmacy and Masters in Healthcare Administration and is a licensed pharmacist in the States of Texas, Oklahoma, Arkansas, Louisiana, Kentucky, Virginia, Arizona and Nebraska. The Relator has knowledge of, and experience in, the retail pharmacy industry through his many years of working as a pharmacist.

Safeway is one of the largest food and drug retailers in the United States. At the time of the events in this case, Safeway operated under the

2

trade name Safeway or through various Safeway-affiliated store banners across the United States including but not limited to: Vons, Pavilions, Dominick's, Genuardi's, Randalls, Tom Thumb, Pak'n'Save Foods and Carrs Quality Centers.  In Illinois, for example, Safeway operated under the Dominick's banner.  The Relator alleges that the policies, practices and procedures for all of the pharmacies are centrally managed and controlled by the national administration and upper corporate management.

Most of the Defendant's stores include a pharmacy department.  At the end of 2013, the Defendant operated 1041 pharmacies across 20 states and the District of Columbia.  The Relator was employed as a pharmacist at Safeway's Tom Thumb #3625 in Grapevine, Texas between June and October of 2011.

The Relator alleges Safeway violated the FCA and caused its subsidiaries to violate the FCA by routinely charging government health programs more than the general public for the same drugs.  The scheme was conceived and directed by Safeway to fraudulently report inflated prices for prescription drugs sold to government health plan beneficiaries.  Safeway

3

knowingly failed to report its actual low drug prices in order to obtain higher reimbursements from government health programs than Safeway was legally and contractually entitled to receive.

The Relator alleges that Safeway's fraud scheme was carried out nationwide at its affiliated pharmacies which are located in multiple states and jurisdictions, several of which are Plaintiffs in this case. The scheme began in or around 2007 and continues to the present. The Relator asserts Safeway administered the scheme in a uniform and consistent manner across the country through centralized policies and pharmaceutical pricing, using interconnected pharmacy and claims-processing computer systems shared by its subsidiaries.

The Relator further contends that through this usual and customary pricing fraud scheme, Safeway submitted false claims and caused its subsidiaries and third parties to submit false claims in violation of the Federal False Claims Act, 31 U.S.C. § 3729 et seq., as amended (Count I). Moreover, Safeway's conduct violated the analogous false claims acts and health care fraud remedial statutes of the ten Plaintiff States and the

4

District of Columbia (Counts II - XII).  Like the FCA, the state statutes impose liability for defined conduct in the nature of fraud, for the submission of false claims, the use of false records and documents and the failure to disclose material information in presenting claims to each respective sovereign's Medicaid programs.

The Relator asserts that Safeway has knowingly submitted or caused to be submitted fraudulent, inflated pricing information on tens of thousands of prescription drug reimbursement claims to government health plans, including Medicare, Medicaid, TRICARE, the Federal Employees Health Care Benefits Program ("FEHBP") and other federal health care programs for the purpose of unlawfully obtaining reimbursement payments higher than those authorized by law.

The Relator alleges venue is appropriate in this district pursuant to 31 U.S.C. § 3732(a) because the Defendant committed acts proscribed by 31 U.S.C. § 3729 in this judicial district.  The material events pled here include Safeway causing the submission of false Illinois Medicaid claims, which are processed in this judicial district in Springfield, Illinois.

The amended complaint states that the Relator believes there has been no prior public disclosure of the allegations and transactions on which the action is based.  If the Court determined otherwise and the question arises, however, the Relator is an original source of the information on which the allegations and transactions in the Complaint are based, pursuant to 31 U.S.C. § 3730(e)(4)(B).

The federal and state government health programs at issue, including Medicare, Medicaid, TRICARE and the FEHBP, among others, offer pharmaceutical benefits to their respective beneficiaries.  These programs do not buy drugs.  Instead, they reimburse providers who dispense covered drugs to program beneficiaries.

The Relator alleges the reimbursement methodologies for different government health programs are functionally equivalent.  The amended complaint generically refers to the usual and customary fraud scheme, which encompasses pricing fraud affecting Medicaid, TRICARE, FEHBP and Medicare.  The Relator asserts truthful determination and reporting of the usual and customary or negotiated price by the pharmacy provider is a

material component of the government health program's payment calculation. When a dispensing pharmacy knowingly charges above the usual and customary or negotiated price to government health plan beneficiaries, the reported pricing information is fraudulent since the lower usual and customary or negotiated prices were not provided to the government health plans. That is the gravamen of the Relator's amended complaint.

The Defendant contends the amended complaint suffers from a number of deficiencies and, therefore, must be dismissed.

## II. DISCUSSION

After a lengthy investigation, the federal government declined to intervene in this case. When the United States declines to intervene in a qui tam FCA suit, the relator may pursue the case on his own, though the action is still technically on behalf of the United States. See Thulin v. Shopko Stores Operating Co., 771 F.3d 994, 998 (7th Cir. 2014) (citing 31 U.S.C. § 3730(c)(3)).

The United States also advised that the States of Maryland and

Colorado decline to intervene.  Accordingly, all claims asserted on behalf of

Maryland and Colorado have been dismissed with prejudice.

### A. Venue

Safeway first contends the amended complaint must be dismissed

because venue is improper in this district and service of process is flawed.

The applicable statute provides:

> Any action under section 3730 may be brought in any
> judicial district in which the defendant or, in the case of
> multiple defendants, any one defendant can be found, resides,
> transacts business, or in which any act proscribed by section
> 3729 occurred.  A summons as required by the Federal Rules of
> Civil Procedure shall be issued by the appropriate district court
> and served at any place within or outside the United States.

31 U.S.C. § 3732(a).  Safeway does not transact business in this judicial

district and has never done so.  Neither Safeway nor any of its subsidiaries

has ever operated a Safeway store in this judicial district.   Although

Safeway once operated 72 Dominick's stores under its banner, all of those

stores were located in the Northern District of Illinois.  Because Safeway is

not found and does not reside or transact business in the Central District

of Illinois, venue would be improper under the first part of § 3732(a).

8

The question thus is whether this judicial district is one "in which any act proscribed by section 3729 occurred." The Relator alleges Safeway's scheme to defraud government health programs was carried out at 72 Dominick's stores in Illinois. The Relator also asserts Dominick's pharmacies submitted Illinois Medicaid claims. Paragraph 33 of the amended complaint provides that false claims for payment submitted by the Dominick's stores to Illinois Medicaid are sent to and processed in Springfield, Illinois. An individual who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment" is liable under the FCA. 31 U.S.C. § 3729(a)(1)(A).

Given the allegations in the amended complaint, the Relator has sufficiently asserted that Safeway violated the FCA by causing false claims to be submitted in this district. Based on the plain language of § 3729, that is enough under the venue provision. This Court recently held that the Central District of Illinois was an appropriate forum for FCA actions under similar circumstances. See U.S. ex rel. Dismissed Relator v. Wilder, No. 11-cv-3286, 2012 WL 2503098, at *2 (C.D. Ill. June 28, 2012) (noting that

the material events included the processing of allegedly false Medicaid claims in Springfield, Illinois, thus making the Central District a more convenient (and necessarily proper) forum.).   Safeway has cited no controlling authority which holds that causing the submission of false claims in this district is insufficient to establish venue.

Accordingly, the Court will deny the motion to dismiss for improper venue.   Because the motion to dismiss for insufficient summons and insufficient service of process is based on the alleged lack of venue, the motion will be denied to that extent as well.

B. Failure to state a claim

(1) Legal standard

In reviewing a motion to dismiss, the Court generally accepts the truth of the factual allegations of the complaint.   Vinson v. Vermilion County, Illinois, 776 F.3d 924, 925 (7th Cir. 2015).   In order to avoid dismissal under Rule 12(b)(6), "the complaint must state a claim that is plausible on its face."  Id. at 928.

Because the FCA is an anti-fraud statute, however, the "claims under

it are subject to the heightened pleading requirements of Rule 9(b)."
United States ex rel. v. AIDS Research Alliance-Chicago, 415 F.3d 601, 604
(7th Cir. 2005).   Therefore, "a party must state with particularity the
circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "The requirement
of pleading fraud with particularity includes pleading facts that make the
allegation of fraud plausible."  U.S. ex rel. Grenadyor v. Ukranian Village
Pharmacy, Inc., 772 F.3d 1102, 1106 (7th Cir. 2014).  "The complaint
must state the identity of the person making the misrepresentation, the
time, place and content of the misrepresentation, and the method by which
the misrepresentation was communicated to the plaintiff."  Id. (internal
quotation marks and citations omitted).

### (2) HIPAA disclosure and alleged violation

The Defendant claims that Count I is fundamentally flawed.
Paragraphs 186 to 188 of the amended complaint provide descriptions of
18 claims for drugs dispensed in Colorado.  Safeway alleges these are the
only relevant transaction-level details provided in support of Count I.
Safeway asserts these transactions which rely on personal health

information were obtained and disclosed in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and cannot be used for that reason.  Safeway moves to strike under Federal Rule of Civil Procedure 12(f) on that basis.

The Relator claims he is protected by the HIPAA Whistleblower exception, which provides in part:

(1) Disclosures by whistleblowers.  A covered entity is not considered to have violated the requirements of this subpart if a member of its workforce or a business associate discloses protected health information, provided that:

(i) The workforce member or business associate believes in good faith that the covered entity has engaged in conduct that is unlawful or otherwise violates professional or clinical standards, or that the care, services, or conditions provided by the covered entity potentially endangers one or more patients, workers, or the public; and

(ii) The disclosure is to:

. . .

(B) An attorney retained by or on behalf of the workforce member or business associate for the purpose of determining the legal options of the workforce member or business associate with regard to the conduct described in paragraph (j)(1)(I) of this section.

45 C.F.R. § 164.502(j).

Federal regulations define "[p]rotected health information" as "individually identifiable health information . . . [m]aintained in electronic media; or . . . [t]ransmitted or maintained in any other form or medium." 45 C.F.R § 160.103.  In order to qualify as individually identifiable health information, the information either "identifies the individual" or provides enough details so "there is a reasonable basis to believe the information can be used to identify the individual."   42 U.S.C. § 1320d; 45 C.F.R. § 160.103.

The Court has reviewed the allegations in paragraphs 186 through 188 of the amended complaint.   None of those paragraphs contain information which identifies the individual.  The Claims Data utilizes alias initials to identify the individual, such as AA, MM, etc.  The applicable regulation permits a covered entity to utilize a coding system unrelated to the identity of the patient so long as the code is not capable of being translated in order to identify the individual.  See 45 C.F.R. § 164.514(c).

Although several of the Claims Data examples relate to the same

13

patient, the identities of the patients are not disclosed by the use of alias initials.  The fact that the Claims Data identifies the dates the prescriptions were filled and/or billed, the store where they purchased, the drug purchased, as well as the alias initials does not provide any information that could be utilized to identify the individuals.  "Health information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual is not individually identifiable health information."   45 C.F.R. § 164.514(a).

Because the information in the amended complaint does not qualify as individually identifiable health information or protected health information, there is no HIPAA violation even if the Relator qualified as a "covered entity" subject to its terms.  Under the HIPAA whistleblower exception, see 45 C.F.R. § 164.502(j)(1), the Relator was authorized to disclose protected health information to his attorneys.  The motion to dismiss or strike on this basis is denied.

### (3) Allegations of FCA violations

In the amended complaint, the Relator alleges that Safeway submitted fraudulent, inflated pricing information to four government health programs–Medicare, Medicaid, TRICARE and FEHBP–in connection with the prescription drug claims, thus violating the FCA and the false claims statutes of California, Delaware, District of Columbia, Hawaii, Illinois, Montana, New Jersey, New Mexico, Nevada and Virginia.

The Medicare, TRICARE and FEHBP programs cap the reimbursement payable to pharmacy providers at the providers' usual and customary prices. Third-party payers such as private insurance companies are generally excluded from usual and customary calculations, making the usual and customary price equal to the amount cash customers pay for the drug. Instead of usual and customary prices, Medicare regulations require Part D beneficiaries to be offered "Negotiated Prices" "reduced by those discounts" or "other price concessions" available at the "point of sale."

The Relator alleges that government health program prescription drug reimbursement rules for Medicaid, TRICARE and FEHBP prohibit

pharmacy providers, such as Safeway, from being reimbursed for drugs at amounts greater than what the provider otherwise charges members of the general public, known as their usual and customary price. "Negotiated Prices" impose a similar ceiling on Medicare reimbursements. The purpose of these price regulations is to ensure that government health programs do not pay more for prescribed drugs than what the government health program beneficiary would have paid the beneficiary not covered by a government health program.

The amended complaint states that government health programs reimburse providers such as Safeway for prescriptions dispensed to program beneficiaries at the lesser of: (1) the pharmacy provider's usual and customary price; or (2) negotiated price; or (3) one or more alternative price types. As for government health programs with reimbursement methodologies that provide for the payment of the lesser of usual and customary price or an alternative price type, the government health program compares the provider's submitted usual and customary price with no dispensing fee against the alternative price types–each alternative price

type consisting of both the ingredient cost and dispensing fee–and reimburses the provider the lesser of the provider's usual and customary price or alternative price type.

In its motion to dismiss, Safeway cites the amended complaint in noting that the Relator's "central allegation is that Safeway was legally required to pass along the benefit of certain discount prescription programs in its reimbursement claims to [government health programs] but failed to do so." Doc. No. 54, at 3. Safeway points to paragraph 192 of the amended complaint, which provides that it "has knowingly engaged, and continues to engage, in the fraudulent pattern and practice of submitting and causing to be submitted false claims for reimbursement to Federal Health Care Programs and State Medicaid Programs with inflated [Usual and Customary] and Negotiated Prices that deny the United States the discounted [Usual and Customary] and Negotiated Prices offered by Defendant to the general public." In citing these portions of the amended complaint, Safeway essentially acknowledges that the Relator has provided fair notice based on the current state of the law.

17

The Relator alleges that beginning in or about 2007, Safeway, through its pharmacies, knowingly perpetrated a multi-faceted false usual and customary pricing fraud scheme against government health programs as corporate company policy.  In order to stay competitive and attract customers, Safeway created and publicly promoted a series of prescription drug discount programs.  These programs were rolled out nationwide and across all Safeway banners and offered deep discounts on prescription drugs.

Beginning in or about 2007, Safeway offered a discount drug formulary of approximately 300 drugs sold at $4 for a 30 days' supply, $8 for a 60 days' supply and $12 for a 90 days' supply.  Safeway also offered to match prices for drugs on Wal-Mart's or other competitors' discount lists.  In addition, Safeway created a "membership club" that was free to join that offered across the board percentage discounts of 10% of all branded medications and 20% of all non-formulary generics.  Because of Safeway's actions, virtually all drugs sold by Safeway were offered at everyday deep discount prices nationwide and across all of Safeway's

brands.

Safeway's corporate promotional materials explicitly stated that the offered "Discounts and Incentives are not available to patients whose prescriptions are paid in whole or part by Medicare, Medicaid or other federal health care programs."  However, if the customers' co-payment exceeded the discount price and the customer asked for the discount, then the transaction was sometimes reprocessed as a cash transaction, though Safeway's normal policy was to process prescriptions through government health program insurance, reporting the usual and customary price when possible to obtain the higher reimbursement.

Government health program reimbursement rules and regulations prohibit pharmacy providers from being reimbursed at amounts greater than what they otherwise charge members of the general public and government health program prescription drug reimbursement rules require that discounts offered to the general public at the point of sale must also be provided to government health program beneficiaries.  The Relator alleges Safeway defrauded government health programs through a centrally-

organized scheme, promoted across multiple states and banners, that was knowingly and intentionally structured to avoid reporting Safeway's actual everyday low discount prices to government health programs as Safeway's required usual and customary prices, materially causing government health programs to overpay claims.

The Relator further asserts that, through its centralized policies and its centrally-managed interconnected computer system, Safeway set and dictated to its subsidiaries the actual low price of discounted drugs that were offered to the general public as well as the falsely inflated prices that were reported to government health programs for the same drugs. Safeway knowingly submitted and caused to be submitted falsely inflated claims for reimbursement to government health programs for all pharmacies it controlled through a centrally-managed, interconnected computer claims processing system.

Safeway has submitted and caused to be submitted (to the federal and state governments, government health programs, pharmacy benefit managers and private prescription drug plans) many thousands of false

claims for prescriptions filled for government health program beneficiaries across the nation, based on the public promotions of its national discount program, the number of pharmacies it operates, the number of drugs involved, the number of government health program prescription drug transactions at each pharmacy and during the relevant time period which began as early as 2007 and continues to the present.

(4) Fair notice of claim

The Relator alleges that beginning no later than 2007, Safeway was facing competition for pharmacy customers from traditional grocery retailers, from non-traditional competitors such as supercenters and club stores and from specialty supermarkets and drug stores. Safeway and its competitors engaged in price competition, which adversely affected Safeway's operating margins in its markets. Around this time, Wal-Mart, Kmart and other pharmacies were offering discount drug programs. Safeway began offering its own discount programs across its banners in the various states in which it operated, including: price matching; an automatic $4 generic program; and, a membership club discount program. Due to the

magnitude of the project, it was rolled out over time across banners and states.  Safeway characterized its discount drug programs as point of sale discounts, not insurance.  Terms and conditions of the offers were provided in stores and posted on its various websites.

The amended complaint states that Safeway first offered, across its banners in multiple states, to match any competitor's price for a prescription drug, most notably those on the Wal-Mart list.  In 2008, Safeway began offering across Western states a free pharmacy "membership club" program that price matched competitors' prices.  In or around June 2008, Safeway announced, promoted and launched in its East Coast and Midwest banners an automatic $4 discount drug program modeled after the Wal-Mart program.  The announcement was publicized in major newspapers and industry publications.  Safeway offered a formulary of approximately 300 generic drugs priced at $4 for a 30 days' supply, $8 for a 60 days' supply, and $12 for a 90 days' supply.  The formulary discount list and terms of the discounts offered were published and publicly available. Safeway continued to offer to price match any competitor's price

for a prescription drug not on its formulary list.   All customers automatically received the reduced formulary pricing.

In price match situations, however, Safeway would always honor the lower price to its customer but would submit its higher usual and customary price to government health program insurance and collect an inflated claim from the government health program.

The amended complaint states that, in or about July 2010, Safeway discontinued the automatic $4 generic program in the places it operated and replaced it with Safeway's membership club program which was also available to the general public.   To continue receiving the discounts, customers were required to join the no-cost club.  In addition to the price matching and $4 discounts customers had already been receiving in the automatic $4 program, club members received the same 10% discounts on all brand name drugs and the 20% discounts on all non-formulary generic drugs.  Safeway did not offer government health program beneficiaries or other third party payers the benefit of the discount price unless their co-payment exceeded the discount price and the customer asked for the lower

price.

The $4 generic program and membership club were part of a centrally organized scheme that Safeway knowingly and intentionally structured to avoid offering and reporting its actual everyday low discount prices to government health programs, materially causing government health programs to overpay claims. Almost all of the Defendant's pharmacies nationwide operated under the membership program where cash customers were offered discount prices but government health program beneficiaries were offered inflated prices, unless their co-payment exceeded the discount price and the customer asked for the lower price. Through its computer systems, Safeway submitted the same fraudulent usual and customary price information to all government health programs, including Medicare, TRICARE, FEHBP and State Medicaid programs, as part of a corporate-wide scheme to defraud government health programs. The "standard" price Safeway submitted nationwide to government health programs for drugs, otherwise offered to cash customers at $4, was $11.99.

The Relator alleges the Defendant's executives understood that the

sole purpose of the membership club program was to manipulate the usual and customary price in order to overcharge third party insurance, including government health programs.  In price match situations, Safeway would honor the lower price to its customer but would bill its higher usual and customary price to government health program insurance and collect an inflated claim from the government health program.

In an effort to avoid offering and reporting its everyday low discount prices to government health programs, Safeway discontinued its automatic $4 discount plan in favor of a membership club program.  For those pharmacies operating under the membership club program, Safeway did not offer customers with government health program insurance the $4 price or the program's other offered discounts (price matching or 10% off brand and 20% off non-formulary generics) unless their co-payment exceeded the discount price and the customer asked for the lower price.  Safeway did not truthfully report the discount prices as its usual and customary prices.  As a result, claims were paid by insurance, including government health programs, at inflated prices.

The amended complaint includes allegations which meet the standard of Rule 9(b).  The Relator has identified the who: Safeway and its affiliated banners.  The amended complaint clearly describes the nature of the alleged fraud: the overcharging of government health plans by Safeway and its subsidiaries by engaging in a centrally controlled scheme to charge government health plans more than the general public for the same drugs, in order to receive a higher reimbursement than it was legally and contractually entitled to receive.  The alleged fraud occurred from at least 2007 to the present.  The Relator alleges it took place nationwide and cites examples from Safeway or Safeway affiliates in Grapevine, Texas, Colorado Springs, Colorado and Fountain, Colorado.   The amended complaint describes in detail how Safeway is alleged to have carried out the fraud scheme.

For all of these reasons, the Court concludes that the Relator has provided fair notice to Safeway of the circumstances it alleges to be fraud.

### (5) Specificity and viability of fraud allegations

The Defendant further asserts that the descriptions of the 18 claims

for drugs dispensed in Colorado–as alleged in paragraphs 186 through 188–would not be sufficient to state a viable federal FCA claim because: (1) as to the Medicare Part D claims, they were reimbursed according to contract, and the Relator does not point to any contractual term Safeway violated; (2) as to State Medicaid claims, the Relator's claims do not demonstrate that Safeway failed to comport with the Colorado statute governing price reporting or any relevant Medicaid reimbursement formula; and (3) as to FEHBP and TRICARE, the Relator lacks the requisite claims detail.  As for Counts II-XII alleging violations of state law False Claims Act statutes, Safeway contends those counts must be dismissed for failure to provide any factual detail and failure to comport with state statutory requirements.

Medicare Part D is a government program that provides public benefits through private prescription drug plans.  Regardless of whether the claims were reimbursed according to contract or whether any contract term or state law was violated, "[t]he [usual and customary price] term is included in state regulations, plans, and contracts related to Medicare Part

D because the Medicare and Medicaid regulations demand that it be." See U.S. ex rel. Garbe v. Kmart Corp., 824 F.3d 632, 644 (7th Cir. 2016).

The Relator details 13 transactions which purportedly were fraudulently submitted to Medicare Part D. Safeway alleges, however, that he fails to identify any operative Part D contract or describe with detail how Safeway purportedly violated any contractual obligations such that it caused false and fraudulent claims to be submitted to the relevant pharmacy benefits manager. Reimbursement for such claims are made pursuant to contractual terms.

Safeway asserts the Relator does not explain the basis upon which he concludes that: (1) the usual and customary price provided was false according to the contractual definition of usual and customary; (2) the usual and customary price was material to the pharmacy benefits manager's contractual reimbursement formula; or (3) the pharmacy benefits manager or Part D plan were defrauded. Safeway contends these failures render the allegations of the amended complaint insufficient. Although all are contract dependent, no contracts are provided.

In a recent case, the United States Court of Appeals considered–among other issues–whether the district court had correctly identified the "usual and customary" price for purposes of the FCA.  See Garbe, 824 F.3d at 637.  The Seventh Circuit observed:

> Our reading of "general public" is consistent with the regulatory structure that gave rise to the "usual and customary" price term. Under 42 C.F.R. § 423.100, the usual and customary (U & C) price means the price that an out-of-network pharmacy or a physician's office charges a customer who does not have any form of prescription drug coverage for a covered Part D drug. The term is included in state regulations, plans, and contracts related to Medicare Part D because the Medicare and Medicaid regulations demand that it be. Id. § 447.512(b).  Its meaning in many state regulations, plans, and contracts is lifted from the federal regulations without significant modification.

Id. at 644 (internal quotation marks and citation omitted).  The court interpreted the applicable regulations to mean that state agencies are not to pay more for prescribed drugs than the prevailing market retail price. See id.  Accordingly, "[r]egulations related to 'usual and customary' price should be read to ensure that where the pharmacy regularly offers a price to its cash purchasers of a particular drug, Medicare Part D receives the benefit of that deal."  Id.  Safeway may not charge state agencies more than

they charge the general public.

The court further stated:

> Allowing Kmart to insulate high "usual and customary" prices by artificially dividing its customer base would undermine a central purpose of the statutory and regulatory structure.  The "usual and customary" price requirement should not be frustrated by so flimsy a device as Kmart's "discount programs." Because Kmart offered the terms of its "discount programs" to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart "discount" prices at issue represented the "usual and customary" charges for the drugs.

Id. at 645.  Accordingly, the court determined that the relator's claims were sufficient to withstand summary judgment.  See id.  If Medicare Part D did not receive the benefit of such a deal in this case, then the Relator's claims are sufficient to withstand Safeway's motion to dismiss.

As for the State Medicaid claims, Safeway contends the Relator's allegations are insufficient to assert an FCA claim because they do not demonstrate that Safeway failed to comport with the Colorado statute governing price reporting or any relevant Medicare reimbursement formula. Safeway asserts that contrary to the allegations in the amended complaint, Medicaid does not restrict prices to the usual and customary price for

generic drugs.  Under the reasoning of Garbe, however, the usual and customary price imposes a cap on the reimbursement Safeway is entitled to when it sells drugs to government health program beneficiaries.  The program funds must be expended in the most "economical manner feasible."  See id. at 644.  Thus, Medicaid restricts reimbursement for drug sales to Safeway's discount club prices.  The usual and customary price for generic drugs is the limit.  Based on the allegation that Safeway received more than the usual and customary price, the Court concludes at this stage that the Relator has alleged a viable claim.

To the extent that Defendant alleges the Relator's allegations are not sufficiently specific, the Relator contends that Rule 9(b) does not demand specificity for every instance of fraud.  The Relator alleges with particularity Safeway's and its affiliates' nationwide fraudulent scheme.  It further alleges claims for payment on an individualized transaction level and provides specific examples of the Defendant's fraudulent conduct.  The Relator need not plead redundant examples for every State or Federal program that Safeway defrauded.  The Relator simply needs "some firsthand information

to corroborate [his] suspicions." Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co., 631 F.3d 436, 446 (7th Cir. 2011) (observing that Pirelli did not necessarily need Illinois data to sufficiently allege the existence of a fraudulent scheme).

The Relator cites examples alleging that Defendant was reporting falsely high pricing information to government health programs that excluded low cash prices. This corroborates allegations that Defendant was committing usual and customary price fraud against multiple government health programs in the same manner and across state lines. In its motion to dismiss, moreover, Safeway does not dispute that it did not pass price match discounts to cash customers on to government health programs. The Defendant simply alleges this practice was legal. Regardless of whether that was once a permitted practice, it is no longer legal under Garbe.

Safeway notes that Garbe does not directly address this factual scenario and it should not be interpreted broadly. In certain settings, moreover, a state has some flexibility in determining reimbursement. See Garbe, 824 F.3d at 643 (noting the definition of "usual and customary"

price that applies "[u]nless state regulations provide otherwise").  At this stage, however, the Court concludes that the Relator's allegations are sufficient to assert a claim under Garbe.

The Relator claims that the fraud scheme asserted here has occurred throughout the country and with every government health program.  The amended complaint includes specific, representative examples of the scheme which has put the Defendant on notice of the allegations.  The Court concludes that the Relator's allegations are sufficiently specific to comply with the requirements of Rule 9(b).

(6) Transactions and internal communications

Paragraph 186 references thirteen Medicare Part D transactions which took place at Tom Thumb Pharmacy in Grapevine, Texas or Safeway Pharmacy in Colorado Springs, Colorado.  Paragraph 187 references five specific TRICARE transactions that took place at Tom Thumb Pharmacy in Grapevine, Texas; Safeway Pharmacy in Colorado Springs, Colorado or Safeway Pharmacy in Fountain, Colorado.  Paragraph 188 references 20 Medicaid transactions that took place at Tom Thumb Pharmacy in

Grapevine, Texas[1] or Safeway Pharmacy in Colorado Springs, Colorado.

Each transaction referenced in paragraphs 186, 187 and 188 lists drug name, quantity dispensed, date and amounts paid by patient and government health plan reimbursement. The patients are identified by alias initials. The reported usual and customary price is an "inflated" negotiated price that the Defendant reported to government health programs. The actual usual and customary price listed is the true cash price offered to the general public. "GHP Allowable" represents what the government health program should have paid, after applying the patient co-pay to the actual usual and customary price. The "Overpayment" is listed as to each transaction, which refers to the amount overpaid by the government health program due to the "manipulation" of the usual and customary price.

_____

[1]The Plaintiffs state they do not seek to enforce and recover on claims for alleged unlawful actions committed by the Defendants against the Texas Medicaid program. They include these allegations regarding the submission of fraudulent, inflated usual and customary prices to Texas Medicaid for illustrative purposes in order to show that Safeway's fraudulent conduct was pervasive across all government health plans and that it knowingly submitted false claims to Texas Medicaid as part of a larger, carefully designed and orchestrated corporate-wide policy to defraud government health programs generally and it did not engage in this practice through accident or through inadvertence.

34

Safeway argues that allegations of a fraudulent scheme are insufficient and the Relator must allege facts on an individualized level. The Relator has alleged no less than 31 individualized pharmacy transactions as representative examples of the false claims. Moreover, the Relator alleges Safeway has employed a nationwide fraudulent scheme which includes transactions over a five-year period. In paragraphs 186-188 of the amended complaint, the Relator cites examples of Safeway's alleged false claims and fraudulent conduct.

Significantly, Safeway's own internal documents and communications reveal that Safeway corporate officials engineered the centrally controlled scheme which resulted in the submission of false claims. The Relator alleges that, in 2009 Jose Alcaine, Safeway Corporate Pharmacy Category Manager, in Pleasanton, California, proposed an extension of the membership program fraud scheme to Michael Topf, Safeway's Director of Finance Pharmacy, Main Meals & Ingredients, and Jesse Talamantez, Director–Pharmacy Supply Chain & Category Management, Safeway Corporate Operations, as follows:

Hypothetical: We pull the $4 programs in Texas, Eastern, Genuardi's and Dominick's and offer the same program; however, as a membership (FREE but customers need to sign up) program:

1. What is the current cost of the $4 program in the divisions mentioned above?
2. What is the potential savings if we make this a membership program?  Thereby not affecting our insurance reimbursements.

Mr. Alcaine performed the calculations with Safeway's Finance Department and reported back to Mr. Topf and Mr. Talamantez that by transitioning to membership for just the named divisions, Safeway would realize $8 million in savings per year.

The amended complaint states that Mr. Alcaine and Mr. Talamantez worked out the details of the scheme and reported back to Mr. Topf, explaining among other things that membership club "Discounts and Incentives are not available to patients whose prescriptions are paid in whole or part by Medicare, Medicaid or other federal health care programs."  The Relator alleges that the communications of Safeway's upper corporate management show those officials clearly understood the intent and purpose of the transition to the membership program was to

overcharge government health programs.

In an email exchange between Mr. Topf and Brian Baer, Safeway's Chief Financial Officer ("CFO"), Mr. Topf explained the program details as follows:

> [A]bout 40% of customers have copays under $4 to begin with so the hope is that these people definitely won't take us up on the $4 offer.  Another 20% should have $5 copays so a large portion of them will essentially be indifferent.

Mr. Baer responded to the email as follows: "I am still a bit hazy on a few pts–as is Jeff . . . . look forward to discussing with you more . . . . it seems like to me this whole thing revolves @ the insurance angle – to get the $10 per item from them vs the $4 cash price . . . . am I off?"  The Relator alleges Mr. Baer understood perfectly "this whole thing" was a scheme intended to overcharge customers' insurance, including government health programs. Mr. Topf directed Mr. Talamantez to brief Mr. Baer on the details of the program.

The amended complaint states that Mr. Alcaine, Mr. Talamantez and their corporate staff directed and supervised the transition from the automatic $4 program to the membership program with division heads.

37

Once the transition was complete, virtually all of Safeway's pharmacies nationwide operated under the fraudulent membership program. As part of the implementation of the membership program, Mr. Alcaine directed that Defendant's corporate claims adjudication software be reprogrammed with new higher usual and customary pricing for all pharmacies, transitioning from the $4 program to the membership program so government health programs and other insurance would not receive the discounted prices. Mr. Topf was informed of this.

The Relator alleges that Safeway's corporate officials understood that the purpose of the transition to the membership program from the automatic $4 program was to manipulate usual and customary prices in order to overcharge third party insurance, including government health programs. Safeway's membership club program was deliberately structured to ensure that government health program beneficiaries would always pay the discount price or less if they "elect" for the lower price but the government, as third-party payor of the majority of the cost, would never receive the benefit of the discounts.

In a 2008 email from Mr. Talamantez to Safeway's western state divisions explaining the membership scheme, he noted that:

Q.  What if a customer is on an insurance plan?
A.   Based on the customer's current insurance co-pay for generics, a customer may elect to enroll in our membership program to get the better pricing.  Once enrolled, if you are matching a generic price from a competitor, Complete the information in PDX, Override the price to match competitor, and Submit transaction online using our membership program and not primary insurance.

Steve Scalzo, Director of Pharmacy Operations at Dominick's Pharmacy (Illinois), understood that although government health program beneficiaries would always pay the discount price or less if they "opt" to pay the lower price, the government would never receive the benefit of the discounts: "Patients may opt to not have their insurance billed if $4 is less than their copay." Julie Spier, Director of Pharmacy Operations Texas, also understood that government health program beneficiaries would always pay the discount price or less but the government would never receive the benefit of the discounts: "[T]he pharmacy will need to process first on the patients regular insurance to see what their copay is and if it is more than the $4 generic – the pharmacy will need to reverse the claim and then move

39

it over to the membership."

Safeway's internal communications show that its directors understood the alleged scheme as a means to manipulate the usual and customary price and charge government health programs more than the general public, in violation of the FCA.

(7) Original source and public disclosure bar

The Defendant alleges that the allegations of the Relator, Thomas Proctor, are substantially similar to a previously filed qui tam complaint that was reported in the news media before the amended complaint was filed and, therefore, the amended complaint must be dismissed on the grounds of the public disclosure bar and the original source requirement.

Safeway states that Tiffany Huckels, a former pharmacist at its pharmacies in Colorado, filed a qui tam complaint against Safeway in Colorado state court on August 5, 2014. On or about March 13, 2016, after the complaint was unsealed and the case was removed to federal court, the legal news website Law360 (www.law360.com) reported and linked to the action. The amended complaint in this case was filed on March 31,

2016.

The FCA directs courts "to dismiss an action or claim . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed," as relevant here, by "the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). The public disclosure "bar is designed to deter parasitic qui tam actions." See Glaser v. Wound Care Consultants, Inc., 570 F.3d 907, 913 (7th Cir. 2009). Safeway contends that Law360 constitutes news media and because it publicly disclosed the Colorado qui tam action, the only issue is whether the Relator's factual allegations or transactions are substantially similar to those advanced by Huckels and, if so, whether he is otherwise an original source.

To determine whether the public disclosure bar applies, courts employ a three-step analysis. See United States ex rel. v. Wisconsin Bell, Inc., 760 F.3d 688, 690 (7th Cir. 2014). The Court first "examines whether the relator's allegations have been publicly disclosed." Id. (internal quotation

41

marks omitted).  "If so, it next asks whether the lawsuit is based upon those publicly disclosed allegations.  If it is, the court determines whether the relator is an original source of the information upon which his lawsuit is based." Id.

Safeway asserts the allegations in the amended complaint are substantially similar to public disclosures in the Colorado case in that both are against the same party and allege the same FCA violation–that Safeway failed to give government health programs the benefit of certain discounts and submitted allegedly fraudulent, inflated pricing information in its prescription drug claims.  Moreover, both actions describe the same means, cover the same general time frame and allege Safeway defrauded virtually the same government health programs.  Safeway further contends that the claims level detail is also substantially similar, given that both relators allege Safeway submitted a $37.17 usual and customary price to Medicare Part D for a 90-day count of L-thyroxine on May 3, 2014, even though Safeway's normal, low case price for the same drug was $10.00 for a 90-day supply.  For these reasons, Safeway asserts the first amended complaint is

"substantially similar" to the Colorado qui tam action.

The Relator's amended complaint does include more detail than the original complaint–the latter is 68 pages while the former is just 29 pages. However, the Relator in the original complaint filed in November 2011 did allege that Safeway had engaged in a nationwide scheme to falsely inflate usual and customary prices reported to government health programs by excluding everyday low prices from its usual and customary price calculations. The original complaint contained allegations that Safeway violated the Colorado False Claims Act in that manner.

The public disclosure "bar applies only when information exposing the fraud has already entered the public domain prior to the relator's suit." See U.S. ex rel. Beauchamp v. Academi Training Center, 816 F.3d 37, 43 (4th Cir. 2016). It was the Relator's original complaint that first alleged–at least on a general basis–the relevant fraud claim. See id. at 45 (noting that the district court erred because it "failed to evaluate the relevant fraud claim," which was "the first amended complaint;" the "second-amended complaint merely added further detail about a claim already alleged."). "Where the

relevant fraud is first alleged before the public disclosure, as occurred here, the suit is plainly not 'parasitic.'" Id. at 45-46 (citing Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 559 U.S. 280, 296 n.16 (2010)).

The Relator here made allegations of a general fraud scheme in November 2011. That was almost three years before Huckels asserted that Safeway engaged in a scheme in Colorado to falsely inflate usual and customary prices reported to government health programs by excluding everyday low cash prices from its usual and customary price calculations. Obviously, some of the Relator's allegations in this case–such as the 2014 claim submitted to Medicare Part D for L-thyroxine– could not have been included in the 2011 complaint.

Although Huckels' complaint may include more specificity, it does not constitute a prior public disclosure. The Relator in this case was first to allege the relevant fraud claim. Accordingly, the Court concludes that the public disclosure bar does not preclude the Relator from proceeding in this case.

The Defendant also contends that Relator Proctor does not qualify as an original source for the allegations in the amended complaint.  The FCA defines "original source" as an individual who either:

> (i) prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or
> (ii) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action.

31 U.S.C. § 3730(e)(4)(B).  Safeway alleges the Relator did not provide sufficient details to qualify as an original source.

In order to be an original source, "[a] relator need not have seen the claims submitted to the federal government . . . but must know enough to make fraud a likely explanation for any overbilling . . . and under § 3730(e)(4)(B) must furnish that information to the United States, not just assert that there is a basis to be revealed eventually."  U.S. ex rel. Baltazar v. Warden, 635 F.3d 866, 870 (7th Cir. 2011).

In the original complaint, the Relator alleged that Safeway "knowingly presented or caused to be presented false or fraudulent claims for payment

45

to the United States" through a nationwide scheme to falsely inflate its reported usual and customary prices.  The Relator's claim was supported by "information on which his allegations were based," including specific details of the alleged fraud, internal communications from Safeway officials and specific false claims showing the scheme was being carried out.  In both complaints, the Relator alleges he is an original source of the information.  The Relator alleges that he voluntarily disclosed this information to the Government prior to filing the action.

Upon accepting the truth of the allegations of the amended complaint, the Court concludes that the Relator qualifies as an original source.

The Court further finds that the Relator would qualify as an independent source because he has knowledge that is "independent of" Huckels' alleged "publicly disclosed allegations."  Safeway acknowledges that 17 of the 18  Colorado pharmacy transactions alleged in Relator Proctor's amended complaint were not disclosed in Huckels' filings.

There is also a basis for concluding that information in Proctor's

amended complaint "materially adds to" the alleged publicly disclosed transactions. This information includes information the Relator claims to have learned while working at Safeway's Tom Thumb pharmacy in 2011 and as corroborated by internal communications from Safeway executives discussing the usual and customary price fraud scheme at Safeway and its subsidiaries.

Based on the allegations contained in the complaints, the Court concludes there has been no prior public disclosure and Relator Proctor is the original source of his allegations.

(8) Remaining claims

Additionally, Safeway claims the allegations as to FEHBP and TRICARE do not assert viable claims because they lack sufficient detail. However, the Relator makes the same type of allegations with respect to FEHBP and TRICARE claims. Paragraphs 54 to 59 and 61 to 64 address how TRICARE and FEHBP establish usual and customary pricing requirements. Because these pricing terms are alleged to exceed Safeway's usual and customary charges to the general public, the Court concludes that

the Relator has alleged plausible claims based on Garbe.

Safeway further asserts the state law claims which are based on state FCA statutes fail for lack of detail and because they do not comply with statutory requirements.  As the Relator asserts, however, a claimant need not plead redundant examples for every state or federal program it is alleged to have defrauded.  The Relator simply needs "some firsthand information" in those circumstances.  See Pirelli, 631 F.3d at 446 (noting that plaintiff did not necessarily need Illinois data to establish the existence of a fraudulent scheme in Illinois).  This is particularly true when, as here, the nature of the fraud scheme alleged here is the same in every state and with every government health program.  The representative examples contained in the amended complaint support the Relator's assertion that government health programs were charged significantly higher prices for prescription drugs than were its cash customers.  The Court concludes that this is sufficient to allege claims for each of the Plaintiff states.

Safeway also alleges that the California, Delaware, District of Columbia, Illinois, New Mexico, Nevada and Virginia claims should be

dismissed because the False Claims Act in each of those States authorize a relator to bring qui tam claims only in the State's own courts or in federal court in that State.

As the Relator asserts, however, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) because the state law claims are related to the federal FCA. The FCA also has a provision authorizing supplemental jurisdiction of related state law claims: "The district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730." 31 U.S.C. § 3732(b). Accordingly, the Court concludes it has jurisdiction over the subject matter.

Additionally, the Relator alleges in paragraph 34 of the amended complaint that, prior to the filing of this action, he served a copy of the complaint and a written disclosure of substantially all material evidence and information he possessed on the United States and on the Plaintiff States. Therefore, the Court rejects Safeway's argument that he failed to comply

with these provisions as to the New Mexico and Virginia statutes and the motion to dismiss Counts X and XII are denied.

## III. CONCLUSION

Based on the foregoing, the Court concludes at this stage that the Relator's allegations are sufficient under Rule 9(b) to assert claims under the FCA and the applicable state laws. The Court further finds that the information was not illegally obtained in light of HIPAA. Accordingly, the motion to dismiss and motion to strike will be denied.

Ergo, the Motion of Defendant Safeway, Inc. to Dismiss the Relator and Plaintiffs' Amended Complaint [d/e 53] is DENIED.

The Defendant's Motion to Strike certain information [d/e 53] is also DENIED.

This action is referred to United States Magistrate Judge Tom Schanzle-Haskins for further proceedings related to discovery and entry of a scheduling order.

ENTER: November 30, 2016

FOR THE COURT:

/s/ Richard Mills
Richard Mills
United States District Judge